FOSTER & CREIGHTON COMPANY,
Plaintiff-Appellant,

v.

WILSON CONTRACTING COMPANY,
INC., Tyler-Hyde Company,
Defendants-Appellees,

v.

UNITED STATES FIDELITY &
GUARANTY CO., Third-Party
Defendants-Appellees.

Court of Appeals of Tennessee,
Middle Section.

Oct. 27, 1978.

Certiorari Denied by Supreme Court
March 19, 1979.

Thomas W. Steele and Joel M. Leeman, Gullett, Steele, Sanford & Robinson, Nashville, for plaintiff-appellant.

John K. Maddin, Jr. and Patrick A. Ruth, Gracey, Maddin, Cowan & Bird, Richard D. Speight, Goodpasture, Carpenter & Woods, Nashville, for defendants-appellees.

## OPINION

TODD, Judge.

The plaintiff, Foster & Creighton Company, a subcontractor, sued its general contractors, R. B. Tyler Company, Inc. (now known as Wilson Contracting Company) and Tyler-Hyde Company, a joint venture, for damages representing extra expenses incurred by delay of and interference with plaintiff in completing its subcontract. Defendants filed a third party action against United States Fidelity and Guaranty Company, surety on the contract of another subcontractor, T. F. Scholes, asserting that plaintiff's damages, if any, were due to the default or delinquency of Scholes and that defendants should have judgment over against United States Fidelity and Guaranty Company for the amount of any judgment recovered by plaintiff against defendants.

The Chancellor awarded plaintiff judgment against defendants in the amount of $26,712.66 and dismissed defendants' third party action against United States Fidelity and Guaranty Company.

Plaintiff has appealed because of dissatisfaction with the amount of the judgment. Defendants have appealed from the award of judgment to plaintiff and from the dis-

missal of defendants' third party action against United States Fidelity and Guaranty Company.

Early in 1957, defendants contracted with the United States Army Corps of Engineers to construct certain improvements at Key Field, Meridian, Mississippi, including resurfacing certain existing runways and grading and paving certain new runways.

On March 11, 1957, defendants contracted with T. F. Scholes to perform the necessary earth moving and grading in preparation for the new paving. The contract provided that Scholes should complete the required work by January 2, 1958.

On March 22, 1957, defendants contracted with plaintiff to perform all paving, including the resurfacing of existing runways and the paving of new runways by January 2, 1958.

It was possible for plaintiff to perform the *resurfacing* without waiting for completion of the work of any other subcontractor, but it was impossible for plaintiff to pave any *new runway area* until it had first been graded by Scholes.

For this reason, the provisions of both sub-contracts requiring complete performance by the same date, January 2, 1958, created a possible situation in which Scholes might complete his grading on time, yet leave no time for plaintiff to complete its paving after grading by Scholes.

During April and May, 1957, representatives of plaintiff and defendants discussed when plaintiff should begin its work which required the "setting up" of a large concrete mixing plant and accessory machinery. Plaintiff desired to delay operations until progress in grading by Scholes was such as to assure completion of grading in time to allow plaintiff to pave without delay. Defendants disagreed and insisted that plaintiff begin operations by July 1. Plaintiff objected to beginning on July 1 because Scholes was having difficulties in grading and his progress did not indicate that he could complete grading to accommodate plaintiff's paving if begun on July 1.

Defendants' supervisor, a Mr. White, told plaintiff's representative that plaintiff must begin repaving existing runways on July 1, and said:

"You can start on the asphalt (resurfacing) and when you get through with that, we'll have the rest of the job where you can proceed along. So come on in."

Early in June, plaintiff began assembling its mixing machinery and, on June 25, 1957, began laying concrete over the existing asphalt runways.

On July 5, 1957, plaintiff notified defendants that it would complete the "asphalt overlay" (resurfacing) within a few days and would not be able to proceed with new paving until some of the grading had been completed. Defendants' representative assured plaintiff that defendants would "do everything they could to get the grade straightened out so we could pave."

On July 19, 1957, plaintiff ceased operations because all of the resurfacing had been completed and none of the grading had been completed for new paving. At this time, plaintiff notified defendants that delay in proceeding with paving would result in extra expense of $6,000.00 per week. Defendants again promised to "get the grade straightened out" for paving, and plaintiff retained its equipment and crew on the job-site without doing any further paving from July 19 to August 14, 1957, when personnel and equipment were removed from the job-site.

At the insistence and direction of defendants, plaintiff returned its equipment and crew to the job-site on September 30, 1957, but no grading was complete for paving at that time. Some grading was completed by October 17, 1957, at which time plaintiff resumed paving. Because of requirements of minimum temperature for pouring concrete, plaintiff was unable to pave continuously during the cool fall and winter weather, and special, additional procedures were required to satisfactorily "cure" the concrete.

Concrete was completed by January 1, 1958, and the joints were sealed by February 2, 1958, which completed plaintiff's con-

tract: Apparently the delay in sealing joints (after January 2, 1958) was not deemed material.

Plaintiff's suit was filed on January 28, 1959, alleging $42,531.57 damages by "breach of express and implied contractual obligations of defendants."

On February 17, 1959, defendants petitioned the U.S. District Court for removal of the cause to that jurisdiction.

On October 3, 1962, the U.S. District Court remanded the cause to the State (Chancery) Court, where the cause was pending until finally determined January 3, 1978, in the manner previously stated.

Defendants have filed five assignments of error, the first three of which are as follows:

"1. The trial court erred in ruling that Tyler-Hyde acted unreasonably in bringing Foster & Creighton onto the job to begin work by July.

2. The trial court erred in holding that by bringing Foster & Creighton onto the job by July 1, Tyler-Hyde incurred a duty to provide so much site preparation at that time as to enable Foster & Creighton to complete its work and move on without interruption or at its own pace.

3. The trial court erred in ruling that the delay experienced by Foster & Creighton was unreasonable."

The Chancellor held:

"The contract between Foster and Creighton and Tyler-Hyde does not expressly provide that Foster and Creighton will be allowed to proceed without delay once they have started their work. Foster and Creighton relies on authority which recognizes an implied obligation on the part of the general contractor to facilitate the work required by the sub-contract. *Wright & Kremers v. State*, 263 N.Y. 615, 189 N.E. 724 (1934), *V. C. Edwards & Co. v. Port of Tacoma*, 83 Wash.2d 7, 514 P.2d 1381 (1973). The court is of the opinion that under the circumstances of this case, where the prime contractor directed the sub-contractor to begin its operations by a certain date, that there is an implied obligation on the part of the prime contractor to allow the other party to proceed without unreasonable delay. Based on that principle, the court is of the opinion that the failure to keep the project moving in July of 1957 was a breach of that implied duty and Tyler-Hyde is responsible for the resulting damages."

Plaintiff's reply brief states:

"Stripped of obfuscation and the Defendants' endless abdications from responsibility, the essence of this case is that an express representation regarding anticipated work progress was made by the general contractor to one of its subcontractors, which representation the general contractor either knew of should have known to be one which could not be fulfilled in view of its knowledge of the prior, totally inadequate work progress of another subcontractor. In reasonable reliance upon these representations, the subcontractor to whom the representations were made put its crew on this job, at its considerable expense, and kept its men there for a period in excess of two months, completing that work which could be done without the performance of preparatory work by the other subcontractor and, even after it had no further work to do, remained on the job for an extended period of time in reliance upon the continued representations of the general contractor that the progress of the preparatory work would be expedited, which representations were never fulfilled . . . ."

The briefs of both appellants go to great lengths in citing authorities and arguing that a general contractor is or is not liable for failure to expedite the work of subcontractors to prevent delay of other contractors. The issue so earnestly argued is not determined by an absolute rule of law applicable to all cases. The correct rule is a rule of contract and reason.

If a general contractor engages a subcontractor to perform a part of the general contract, there is an implied understanding that the subcontractor will be giv-

en a reasonable opportunity to perform. The subcontractor is not liable for failure to perform if he has not been afforded a reasonable opportunity to perform, and in a proper case, may recover damages for such denial of opportunity.

■ If the contract requires the subcontractor to complete performance by a certain date, then the subcontractor cannot be held liable for failure to complete on time unless he has been afforded a reasonable opportunity to perform, and, in a proper case, may recover damages for denial of such opportunity.

■ Moreover, a general contractor may, in a proper case, be liable to a subcontractor for wrongfully interfering with performance by the subcontractor.

However, none of the above rules are applicable to the present case, because plaintiff was allowed to perform and did complete its work on time. Plaintiff's complaint is based upon the delay of Scholes and the failure of defendants to require Scholes to work faster or to substitute another subcontractor to do the grading. Since the grading was ultimately finished in time to allow plaintiff to complete its paving on time, no breach of contract is seen in Scholes' slowness or defendants' failure to speed his work.

Plaintiff complains that it was "required" to begin work on July 1, which was too soon for efficient coordination with the grading of Scholes. The briefs do not point out the authority whereby defendants "required" plaintiff to begin on July 1. Plaintiff simply says that defendants announced that if plaintiff did not begin by July 1, defendants would "call in another contractor" to do the paving. This was, of course, persuasive but can hardly justify plaintiff in "setting up" its machinery at considerable cost and starting operations when it knew the operations could not be continued efficiently to completion due to the delays in grading.

Defendants say they insisted upon the paving being started by July 1, because the Corps of Engineers so insisted. Neither brief points out to this Court wherein the Corps of Engineers or defendants had a contractual right to demand that paving begin on July 1.

Plaintiff was in a peculiar position, known to defendants, Scholes and the Corps of Engineers. Plaintiff's work required the "setting up" of a large concrete mixing plant with accessory equipment. Three weeks were required for the erection of this plant. It was therefore reasonably to be expected that plaintiff would be allowed to erect its mixing plant and begin operations at a time when it would be able to perform all of its contact (both resurfacing and new paving), for it would be patently unreasonable to require the erection of such an elaborate plant for part of the work only to dismantle it after part performance and to re-erect it later for completion of the contract.

Plaintiff therefore had the right to refuse to begin the assembly of its mixing plant until the entire project was in such a state of completion that plaintiff could proceed without delay in prosecuting its paving. For example, plaintiff had the right to delay the erection of its plant until September (when it was erected for the second time) demands and protests of the Corps of Engineers and defendants to the contrary notwithstanding. If plaintiff had so delayed, it could have readily completed the resurfacing by the completion of grading on October 17, and thereafter performed the new paving as was done.

Plaintiff did not see fit to so delay, but saw fit to accede to the demands of defendants for beginning on July 1. Why? If plaintiff started work on July 1 merely because of an unjustified threat by defendants to breach its contract, it is doubtful that plaintiff could recover.

As stated in plaintiff's brief (previously quoted), plaintiff's claim is based in reality upon detrimental reliance upon representations or promises of defendants. (i. e. "you can start on the asphalt and when you get through with that, we'll have the rest of the job where you can proceed along. So come on in.")

Detrimental reliance is a relatively new theory or ground of recovery. It is a branch or restatement of the law of contracts in regard to required consideration.

Generally, a promise unaccompanied by a consideration is unenforceable. 17 C.J.S. Contracts § 71, pp. 748 et seq. However, when one man by his promise induces another to change his situation, a repudiation of the promise would amount to a fraud. Where one makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and where such promise does in fact induce such action or forbearance, it is binding if injustice can be avoided only by enforcement of the promise. 17 C.J.S. Contracts § 74, p. 764.

The same rule has been called the doctrine of promissory estoppel. In 17 Am. Jur.2d, Contracts, § 89, pp. 431, 432, is found the following text:

"The trend of modern cases is to extend the rule of estoppel to promissory statements, where the evidence clearly shows that the statements were made to induce action and the promisor was culpable in some respects. But in order for the doctrine of promissory estoppel to apply, the promise which is sought to be enforced must have induced action of a definite and substantial character by the promisee. Also, justifiable reliance and irreparable detriment to the promisee are necessary factors to enable him to invoke the doctrine of promissory estoppel. Generally speaking, the mere fact that a promisee relies upon a promise made without other consideration does not impart validity to what before was void. There must be some ground for saying that the acts done in reliance upon the promise were contemplated by the contract, either impliedly or in terms, as the conventional inducement, motive, and equivalent for the promise."

Defendants represented or promised to plaintiff that the grading would proceed to completion on a schedule that would enable plaintiff to begin paving the new grading as soon as the resurfacing was completed (having been started on July 1). Defendants knew that plaintiff would rely upon the representation or promise; plaintiff did indeed rely thereon; the promise was not kept; and plaintiff suffered damage thereby.

The same facts from a slightly different viewpoint present a classic case of a contract by exchange of promise for performance. One party requests the other party to do something he is not obliged to do. The first party says, "If you will do this, I will do that." The second party does this; the first party is bound to do that in accordance with his promise. Defendants urged plaintiff to begin sooner than he was obligated to begin, and promised the grading would be ready. Plaintiff began work early in reliance upon the promise, the promise was not fulfilled, and plaintiff was damaged thereby. Defendants' collateral promise made with good consideration, and it is enforceable.

It is no defense that the true wrongdoer was Scholes, or that defendants did the best they could to speed the work of Scholes. The promise was that the grading would be ready. It was an independent assurance of a condition which defendants were bound to make good or to indemnify plaintiff for loss.

In summary, plaintiff is entitled to damages for the breach of defendants' promise that:

"You can start on the asphalt and when you get through with that, we'll have the rest of the job where you can proceed along. So come on in."

and not otherwise.

This holding is not in complete harmony with that of the Chancellor, but it produces the same results. A correct result will not be reversed even though the appellate court does not agree with the reason assigned for the result by the trial judge. *Cherokee Insurance Company v. United States Fire Insurance Company,* Tenn.App. 1977, 559 S.W.2d 337.

The defendants' first three assignments of error are respectfully overruled.

Defendants' fourth assignment of error is as follows:

"4. The trial court erred in finding that Foster & Creighton's damages were proved with reasonable certainty."

The Chancellor allowed the following items of damage:

"A. Wages paid to workers during the period in which work was suspended. ($3,444.00)

B. Rental value of equipment. ($9,000.00)

C. Demurrage on railroad cars at job site. ($4,070.52)

D. Loss on forced sale of cement. ($1,506.83)

E. Cost of moving men and equipment back to the job site in September, 1957. ($8,695.31)"

The Rules of this Court require that the appellee make answer to each assignment of error with citations to the record as to matters of fact. It would seem that somewhere within two briefs comprising 122 pages, the plaintiff would have enlightened this Court as to where its evidence of damages might be found in an unusually voluminous record. Alas, the voluminous briefs have been searched in vain for the vital and required information, but without success.

■ From a review of the depositions and exhibits composing almost 1500 pages, this Court is satisfied that the evidence supports the damages awarded by the Chancellor and does not preponderate against his judgment. As would be expected from testimony and records brought into court so long after the fact, the evidence leaves considerable to be desired, but it is, nevertheless, sufficient.

Defendants' complaints that payments to employees did not represent actual loss; that the rental value of equipment was not properly proven, that railroad car demurrage and loss on resale of cement resulted from negligence of plaintiff, and that cost of moving men and equipment back on the job was not a proper item—all have been considered in the light of the record and have been rejected.

The fourth assignment of error is respectfully overruled.

Defendants' fifth and last assignment of error complains of the Chancellor's failure to render judgment over against United States Fidelity & Guaranty, surety for Scholes.

■ The previous comments herein regarding the mutual duties of contractors and the grounds of recovery in the present case are equally applicable to the fifth assignment. United States Fidelity & Guaranty became surety for any liability of Scholes for breach of his contract. At most, his obligation was to finish his grading in time to allow plaintiff to finish paving on time. He did so. There is no evidence that he breached his agreement, hence there is no ground for recovery against United States Fidelity & Guaranty.

Defendants' fifth and last assignment of error is respectfully overruled.

■ Plaintiff's first assignment of error complains of the Chancellor's failure to allow damages for plaintiff's additional expenses resulting from operations in cold weather, rather than in warm weather.

Regardless of the reasons assigned by the Chancellor, his conclusion was correct. As previously stated, plaintiff had no right to perform at any particular time so long as a fair opportunity was afforded for completion of the work within the assigned time (by January 2, 1958). This opportunity was afforded, hence there can be no damages for changing the time of work from summer to winter. The contract between the parties did not assure performance in summer or winter.

Plaintiff's first assignment of error is respectfully overruled.

Plaintiff's second assignment of error complains of the failure of the Chancellor to award interest.

■ Interest for the 20 years between the accrual of the damages and the present time would more than double the recovery. Absent a showing of dilatory tactics of delay, it is doubtful that defendants should be taxed with interest during

such a lengthy period while the lawsuit is pending. Moreover, this is an action for unliquidated damages for breach of contract (promissory estoppel or detrimental reliance) wherein the allowance of interest is not a matter of right but of discretion on the part of the finder of fact who assesses the damages.

This Court agrees with the decision of the Chancellor to disallow interest.

All assignments of error have been overruled. The decree of the Chancellor is affirmed. A judgment will be entered in this Court dismissing defendants' suit against United States Fidelity & Guaranty Company and awarding plaintiff, Foster & Creighton Company, a judgment against the defendants, Wilson Contracting Company, Inc., Tyler-Hyde Company, a joint venture, and United States Fidelity & Guaranty Company, surety on their appeal bond, for $26,712.16 plus statutory interest from date of the Chancellor's decree to date of the judgment of this Court plus all costs, including costs of this appeal; however, the amount of liability of United States Fidelity & Guaranty Company shall not exceed $28,850.00, the amount of the appeal bond.

Affirmed and rendered.

SHRIVER, P. J., and LEWIS, J., concur.