IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
JUNE 18, 2001 Session

## VARNER CONSTRUCTION COMPANY, INC., and THE ESTATE OF BROOKS VARNER v. DAVID M. MARRS AND LATITIA M. MARRS

An Appeal from the Chancery Court for Shelby County
No. 90765-2     Floyd Peete, Chancellor

No. W-2000-01029-COA-R3-CV - Filed April 18, 2002

This is a construction case.  In 1981, the defendant owners hired the plaintiff construction company to build a custom home.  Over the course of construction, the parties disagreed over many things, and their relationship ended in July or August 1983.  The construction company sued the owners, alleging that the owners had not paid the full amount due under the contract.  The owners filed a counterclaim, alleging that the construction company owed them for amounts expended in completing the project and for estimated amounts to cure remaining defects.  The chancellor referred the case to a special master who, after taking the case under advisement for a lengthy time, issued findings which favored the construction company.  The chancellor adopted the findings of the master and awarded the construction company damages plus prejudgment interest.  The owners now appeal. We affirm in part, reverse in part and modify.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment in the Chancery Court is Affirmed in Part, Reversed in Part and Modified.**

HOLLY K. LILLARD, J., delivered the opinion of the court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, joined.

John J. Heflin, III, and Kenneth P. Jones, Memphis, Tennessee, for the appellants, David M. Marrs and Latitia M. Marrs.

J. Frank Hall, Memphis, Tennessee, for the appellees, Varner Construction Company and the Estate of Brooks Varner.

### OPINION

This is a construction case.  About twenty years ago, defendants David M. Marrs and Latitia Montague Marrs (collectively "Owners") hired Varner Construction Company ("Contractor"), owned by James Varner, to build a custom-designed, concrete, partially-underground residence at

3191 Airline Road in Eads, Tennessee.[1]  On November 24, 1981, the parties signed a standard Amercan Institute of Architects Contract ("AIA Contract"), which detailed the specifications of the residence and set the contract price at $328,000.  Over the course of construction, approximately twenty-eight change orders were issued relating to a variety of details ranging from ice-makers to spiral ducts.  The changes resulted in approximately $30,000 more due under the contract.

All of the work performed on the home took place in 1982 and 1983.  It is undisputed that the parties disagreed over many things including, but certainly not limited to, the timeliness and quality of the Contractor's work, the Owners' failure to make progress payments to the Contractor in a complete and timely manner, and the Contractor's failure to pay subcontractors.  On approximately July 14, 1983, James Varner and David Marrs engaged in a "fist fight," apparently stemming from Mr. Marrs' belief that Mr. Varner had a romantic interest in Mrs. Marrs.  Mr. Marrs told Mr. Varner not to come back on the property.  Mr. Marrs changed the locks on his residence, and the altercation apparently marked the end of James Varner's work on the job.

In a letter dated August 22, 1983, the architect on the job, Bill Fuller ("Fuller"),[2] wrote a letter to the Contractor detailing twenty-two items on the project that needed to be completed:

> On all exterior conc. drill holes missing so as to continue the pattern left by the tie rods.
> Caulk over the backer rod at the skylite [sic].
> Clean the skylite [sic] on the east side between the two plastic panels.
> install [sic] cover flanges at the solar system conection [sic] of the PVC and metal duct at the roof.
> Tighten the fire place flue head.
> Tighten the 'c' anchors that hold the solar panels to the frame.
> Clean the tape marks off the solar panels.
> Install the Kitch. Exhaust fan on the roof.
> Clean and polish all door knobs.
> Touch up paint at the metal hand rails.
> At the upper gtass [sic] between the M. bedroom and the garden clean the white paint off of the metalso [sic] as to have a straight line.
> Install the hand sprayer on the sink at the N.W. bathroom.
> Repair the leaks at the downstaires [sic] mech. room at the mech. system and at the solar system.
> Anchor and level commode in the S.W. bathroom.
> At the downstairs mech room use wire nuts at the splices of wires for the intercom system.
> Install relief valves at the water tanks and water storage tanks.

---

[1] At the time of the contract, the Marrs were married, but now they are divorced.

[2] Fuller was also the Owners' neighbor on Airline Road.

repair [sic] the steam shower head leak.
Install the icemaker with pump at the bar.
Restain the bridge floor.
Clean all [the] trash from site.
Complete cabinets.
Install intercom system in livingroom.

("August 22 letter"). In the letter, Fuller stated that "[w]hen the . . . list is complete to my satisfaction I shall issue a certificate of substantial completion." Brooks Varner, James Varner's father who had joined his son in working on the job, testified that he and his subcontractors went back to the site four or five times to complete the items on the architect's list. On September 13, 1983, however, Mr. Marrs filed a Notice of Completion in the Shelby County Register's Office in which he stated that he, rather than the Contractor, substantially completed the work. Whether the Contractor or the Owners should receive credit for completing different parts of the project is the subject of much dispute. Over the course of construction, the Owners paid the Contractor at least $313,868 and paid the Contractor's subcontractors at least $19,789.

In late August 1983, the owners moved into their new house. On January 10, 1984, the Contractor filed suit against the Owners, claiming that the Owners still owed money under the construction contract. The case was not pursued, however, until 1990, when the Owners answered the complaint and asserted their counterclaim for costs incurred in completing the construction of their residence. In October 1990, the chancellor entered an order referring the case to a master and directing the master to answer twenty-five specific questions pertaining to the parties' claims. The master held hearings on February 5 and 6, 1991, and continued on July 2, 1991.

For reasons not apparent in the record, the master's report was not issued until approximately seven years later, on April 24, 1998. The report answered all of the chancellor's inquiries and ultimately recommended a finding in favor of the Contractor. The Contractor filed a motion to confirm the master's report, and the Owners filed an objection the report. Following oral argument, on April 3, 2000, the chancellor entered a final judgment adopting all of the master's conclusions, including the finding that the Owners owed the Contractor $21,838 on the construction contract and $12,000 in prejudgment interest, for a total judgment of $33,838.[3] In accordance with the recommendation in the master's report, the trial court dismissed the Owners' counterclaims. The Owners now appeal, challenging the chancellor's order adopting the findings in the master's report.

We review this case in accordance with the concurrent finding rule. Under that rule, concurrent findings of the master and the chancellor are conclusive and binding on the appellate court, except where the finding under scrutiny is (1) upon an issue not proper to be referred; (2) based on an error of law; (3) based on a mixed question of law and fact; or (4) not supported by any

---

[3] The judgment is in favor of the estate of Brooks Varner, James Varner's father, because the original plaintiff, Varner Construction Company, assigned its interest in the suit to Brooks Varner, who is now deceased.

material evidence. *See Staggs v. Herff Motor Co.*, 390 S.W.2d 245, 251 (Tenn. 1965); *Aussenberg v. Kramer*, 944 S.W.2d 367, 370 (Tenn. Ct. App. 1996); *Shepherd v. Griffin*, 929 S.W.2d 336, 344 (Tenn. Ct. App. 1995); *see also* Tenn. Code Ann. § 27-1-113 (2000) (stating that "the court of appeals shall not have the right to disturb" a concurrent finding of the master and chancellor). The Contractor alleges numerous errors in the master's report and in the chancellor's subsequent order. We will address each argument in turn.

The Contractor initially makes the argument that we must vacate the chancellor's order in total, or at least give his findings closer scrutiny, because the record shows that he did not exercise his independent judgment in adopting the master's report. Rather, the Contractor alleges, the chancellor simply "rubber-stamped" the report without making any deliberate analysis. *See Blankenship v. Blankenship*, No. 02A01-9603-CH-00051, 1997 Tenn. App. LEXIS 42 (Tenn. Ct. App. Jan. 17, 1997). *Blankenship* involved a complicted boundary dispute. In that case, the appellate court vacated the trial court's judgment adopting the special master's report because it was apparent from the record that the trial judge failed to exercise independent judgment in adopting that report. Specifically, at the outset of trial, the trial judge informed the parties that the master would determine where the disputed boundary lay, commenting that "that's the way it's going to have to be, because I can't make heads or tails out of this." *Id.* at *3. After the master had issued his report, the trial judge refused to allow the parties to offer further evidence to support their positions, stating that "if [the master is] wrong, he's just wrong and you have a right to appeal it." *Id.* at *5. In light of that evidence, this Court vacated the trial court's judgment and remanded with instructions for the trial court to reconsider the matter independently and permit the parties to offer additional evidence on the location of the boundary. *Id.* at *7-*8.

In the case at bar, the Owners contend that the chancellor abdicated his responsibility to evaluate independently the circumstances of this case. The Owners rely on a statement in the chancellor's order that "the Special Master has discretion to accept or reject testimony and therefore the Special Master was well within his scope of discretion to make the findings set forth in his report." The Owners assert that this statement shows that the trial court impermissibly deferred to the findings of the master without exercising independent judgment based on the evidence. The Owners argue that such a conclusion is particularly compelling in the instant case, in which the master's decision was not issued until approximately seven years after the submission of evidence.

While the time for which this case has been pending is indeed excessive, the record contains no evidence of prejudice to the parties from the delay. More importantly, unlike *Blankenship*, the chancellor in this case did not preclude evidence offered to rebut the findings of the master. Instead, the record shows that the trial court heard oral arguments on the matter and deliberately weighed the evidence. As the court in *Blankenship* recognized, "[a] trial court is entitled to adopt a special master's report in full. T.C.R.P. 53.04(2)." *Id.* at *5. Under these circumstances, we find no evidence to support a finding that the chancellor abdicated his responsibility to exercise independent judgment.

-4-

For the remaining issues, the Owners assert that certain enumerated findings of the master, adopted by the chancellor, were not supported by any material evidence. The applicable provisions in the parties' AIA Contract are as follows:

ARTICLE 2: ARCHITECT

\*     \*     \*

2.2.7     The Architect will be the interpreter of the requirements of the Contract Documents and the judge of the performance thereunder by both the Owner and Contractor.

\*     \*     \*

2.2.11     The Architect's decisions in matters relating to artistic effect will be final if consistent with the intent of the Contract Documents.

\*     \*     \*

2.2.13     The Architect will have authority to reject Work which does not conform to the Contract Documents.

\*     \*     \*

ARTICLE 13: UNCOVERING AND CORRECTION OF WORK

13.2     CORRECTION OF WORK

13.2.1   The Contractor shall promptly correct all Work rejected by the Architect as defective or as failing to conform to the Contract Documents whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Contractor shall bear all costs of correcting such rejected Work, including compensation for the Architect's additional services made necessary thereby.

13.2.2   If, within one year after the Date of Substantial Completion of the Work or designated portion thereof or within one year after acceptance by the Owner of designated equipment or within such longer period of time as may be prescribed by law . . . any of the Work is found to be defective or not in accordance with the Contract Documents, the Contractor shall correct it promptly after receipt of a written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition. This obligation shall survive termination of the Contract. The Owner shall give such notice promptly after discovery of the condition.

The Owners challenge the following findings of the master, asserting that there is no material evidence to support each finding:

QUERY 2:

What change orders were agreed to and signed by the proper persons?

FINDING 2:

The Master **finds** that the first change order was signed by the architect, Fuller[,] the contractor Varner and the owner Marrs. Subsequent change orders were signed only by Varner & Marrs. There were two change orders (Ref. Ex. 61 and 62) that the architect denied signing. (Trcp. p. 416 line 18 to p. 418 line 20; p. 432 line 12-p. 434 line 7). However, on the Applications and Certificate for Payment for the period 04/20/83 to 05/30/83 the architect's signature on 06/10/83 was not questioned and showed change orders (1022) totaling $27,887.00 (Ref. Ex. 6).

In addition to this $27,887.00, Marrs agreed to pay for the following changes not previously shown in Application and Certificate For Payments (Ref. 6)

| | |
|---|---|
| Change Order #27 dated 04/14/83 | $485.00 |
| (Trcp. p. 244 line 7-11, Ref. Ex. 5) | |
| Change Order # - dated 05/03/83 | 500.00 |
| (Trcp. p. 240 line 4-10, Ref. Ex. 5) | |
| Brown Sheet of Paper Change Order | 1,828.00 |
| (Trcp. p. 240 line 12-15, Ref. Ex. 19) | |
| | 2,813.00 |
| Previously approved Change Orders | 27,887.00 |
| TOTAL CHANGE ORDERS | 30,700.00 |

\*     \*     \*

QUERY 5:

What amount of money was paid by the Defendant to the Plaintiff pursuant to the contract?

FINDING 5:

The Master **finds** that the Defendant paid $313,868.00 to the Plaintiff. (Trcp. p. 341 line 24 - p. 342 line 2; Ref. Ex. 9)

QUERY 6:

Were these payments [progress payments to Varner] made when they were supposed to be made?

FINDING 6:

\*     \*     \*

Article 9.4.1 requires the architect to certify the application for payment within seven days or notify the contractor of reasons for referral to certify. (Ref. Ex. 3)

Article 9.5.1 provides that after Architect has certified the application for payment, the Owner shall make payments in the manner and within the time provided in the Contract Documents. (Ref. Ex. 3)

Article 5 PROGRESS PAYMENTS in the Standard From [sic] of Agreement Between Owner and Contractor (Ref. Ex. 1) provides that payment should be not later than ten days following the end of the period covered by the Application For Payment (Note: this is the same as the billing date in most instances). The Master **finds** that the following payments were made in excess of the ten day provision: Application #3 (6 days late), #4 (1 day late), #5 (22 days late), #6 (3 days late), #8 (4 days late), #9 (51 days late), #10 (17 days late), #12 (3 days late), #13 (60 days late) #14 (20 days late), #17 (still unpaid)

\*     \*     \*

QUERY 8:

Did the Plaintiff perform under the contract what was supposed to be done under the contract?

FINDING 8:

The Master **finds** that Bill Fuller, Architect, in his letter of August 22, 1983 (Ref. Ex. 18) indicated that he would issue a certificate of substantial completion upon the completion of the [22 items quoted above] to his satisfaction . . . .

The Master **finds** that the owner filed a Notice of Completion on September 13, 1983 in the Shelby County Register's Office which was recorded as Instrument No. U5 9321, in which the owner states that he rather than the contractor has substantially completed the work. (Ref. Ex. 71).

-7-

QUERY 9:

If the Plaintiff did not perform what was supposed to be done, what did the Plaintiff do or not do, that was supposed to be done or not done?

FINDING 9:

J. Varner testified that he did not recall or did not complete the architect's punch list (Trcp. p. 123 line 19- p. 128 line 1).

B. Varner testified that he personally completed some of the items on the punch list and that the subcontractors completed other items. He further testified that since Marrs paid the subs their retainage, the subs were not inclined to return to the job (Trcp. p. 148 line 3 - p. 152 line 24).

D. Marrs testified regarding the punch list:

**Expenses allowed by Master-**

>Clean skylite [sic]-Lincoln Glass 10/10/83    $392
>(Trcp. p. 266 line 1-21, Ref. Ex. 48)

**Expenses disallowed by Master- (failed to carry burden of proof)**

>Install icemaker-Sears 9/24/83
>(Trcp. p. 267 line 11-18, Ref. Ex. 50)
>Clean all trash from site
>(Trcp. p. 268 line 13-18, Ref. Ex. 52)
>Complete Cabinets-estimated cost
>(Trcp. p. 286 line 11-21)
>Install Intercom System
>(system was installed but did not work
>Trcp. p. 282 line 19 - p. 283 line 7)
>Part of punch list & part for Varner
>Himmer (Trcp. p. 271 line 15- p. 276 line 24, Ref. Ex. 56 I.D.)

* * *

QUERY 14:

What is the nature, extent and character of any defects in workmanship attributable to the Plaintiff?

FINDING 14:

There was voluminous testimony on defects:
a) Repair of solar panels (Trcp. p. 250-256);
b) Replace dirt & sod (Trcp. p. 257-260);
c) Varner equipment tore up ground (Trcp. p. 258);
d) Varner equipment tore up driveway (Trcp. p. 262-265);
e) Repair skylite [sic] leak (Trcp. p. 266);
f) Icemaker never furnished (Trcp. p. 267);
g) Roof leak (Trcp. p. 268);
h) Trash at site (Trcp. p. 268-270);
i) Failure to pay for door (Trcp. p. 271);
j) Failure to complete punch list (Trcp. p. 271-276);
k) Repair intercom system (Trcp. p. 282-283)
l) Honeycombs in concrete exterior walls (Trcp. p. 45, 93, 130, 279, 402, 405-407);
m) Honeycombs in concrete interior walls (Trcp. p. 403-404, 408-409);
n) Concrete floor (Trcp. p. 283-284, 400-402, 407-408);
o) Cabinets not stained (Trcp. p. 286);
p) Concrete around pool (Trcp. p. 410-411).

The Master **disallows** these claims [based on the Application and Certification for Payment signed by the architect (Application #16) on 6/10/83 (Ref. Ex. 6) which indicates that the project was substantially complete and from the architect's punch list (Ref. Ex. 18) which does not show these items; the Defendant also did not carry his burden of proving damages] except for those itemized in finding 9.

\* \* \*

QUERY 15 a (Revised):

If any defects existed in the work after Plaintiffs stopped work, did Plaintiffs cure them?

FINDINGS 15 a:

Brooks Varner testified that he or the Subcontractors corrected or tried to correct the defects noted on the architect's punch list (Trcp. p. 147-153, Ref. Ex. 18), however, the Master **finds** that no "official" written acceptance was produced by either party.

*    *    *

QUERY 20:

What amount of money does the Defendant owe the Plaintiff, or in the alternative, what amount of money does the Plaintiff owe the Defendant?  Give the reasons.

FINDING 20:

Based on Application #16 of the Application and Certification for Payment (Ref. Ex. 6), the Master **finds** that

| | | |
|---|---|---|
| Contract Sum | | $328,000 |
| Change orders | | 27,887 |
| Total | | $355,887 |
| Less: Payments (Schedule A) | $313,868 | |
| Payments Allowed (Finding 9) | 392 | |
| Payments to Subs (Finding 10) | 19,789 | 334,049 |
| **Total Due Plaintiffs** | | **$21,838** |

*    *    *

QUERY 22 (Revised):

When the Defendant moved into the house, what defects, if any, remained?

FINDING 22:

The Master **finds** that the following defects had not been remedied, however the Defendant failed to carry his burden of proving damages:

Clean skylite[sic]-Lincoln Glass 10/10/83
(Trcp. p. 266 line 1-21, Ref. Ex. 48)
Install icemaker-Sears 9/24/83
(Trcp. 267 line 11-18, Ref. Ex. 50)
Clean all trash from site
(Trcp. p. 268 line 13-18, Ref. Ex. 52)
Complete Cabinets-estimated cost
(Trcp. p. 286 line 11-21)
Install Intercom System
(system was installed but did not work
Trcp. p. 282 line 19 - p. 283 line 7)
Part of punch list & part for Varner

-10-

Himmer (Trcp. p. 271 line 15- p. 276 line 24, Ref. Ex. 56 I.D.)

We will address each challenged finding to determine whether there is material evidence to support the concurrent finding of the master and the chancellor.

### *Objection to findings number 2 & 5*

The Owners argue that finding numbers 2 and 5 are erroneous because finding number 2 specifically charges the Owners with a $1,828 change order (referred to as the "Brown Sheet of Paper Change Order") for the installation of gold mirrors, but finding number 5 fails to give the Owners credit for the uncontroverted $1,650 payment for the mirrors made on July 11, 1983. The Contractor does not dispute that the Owners should be credited for this payment, so long as the corresponding change order is included as a valid cost. Therefore, because the Owners are charged for the "Brown Sheet of Paper Change Order" in finding number 2, they should be credited with the $1,650 payment in finding number 5. There being no dispute about this credit to the Owners, we find that there is no material evidence to support the concurrent finding of the special master and the chancellor on this issue, and hold that the Owners should be credited $1,650 for this item.

### *Objection to finding number 6*

As to finding number 6, the Owners complain that, although the master found that certain progress payments were untimely, he did not indicate whether the failure to pay was justified or unjustified. No damages are alleged to have resulted from the delay in payment. Consequently, this issue is without merit.

### *Objection to findings number 8 & 14*

In the August 22 letter quoted above, Fuller made a list of defects that, in his opinion, needed to be remedied by the Contractors before the job would be "substantially complete." The Owners argue that in findings number 8 and 14, the master assumed that the August 22 letter was an exhaustive "punch list" of all defects as of the date of the letter, and that all defects omitted from the list were either not cured or were not the Contractor's responsibility. The Owners argue that the master's assumption in this regard was erroneous, and that the disallowance of any expense simply because the defect was not listed in the August 22 letter should be reconsidered.

Contrary to the Owners' assertion, the record reflects that the master did not specifically determine that the August 22 letter was intended to be an exhaustive list of defects, or that the cost to remedy defects that were omitted from the list should be automatically disallowed. Rather, the master noted that certain defects were or were not on the list, and he considered that fact as probative evidence of whether Fuller deemed the curing of that defect as necessary for the "substantial completion" of the project. Therefore, if the existence of a defect is disputed, the omission of that defect from the August 22 letter would be relevant to show that Fuller did not consider it necessary

-11-

to remedy that defect at the time the letter was written. However, if the evidence is undisputed that a particular defect existed and that the Contractor was responsible for curing it, the fact that the defect was not included in the August 22 letter is irrelevant. At this juncture, then, we find that the master's findings number 8 and 14 were not generally erroneous. We will later address the specifics regarding certain items of reimbursement claimed by the Owners.

### *Objection to finding number 9*

The Owners assert that there is no material evidence to support the master's allowance of $392 for having the skylight cleaned by Lincoln Glass, and at the same time disallowing five other items for which the evidence was substantially similar. In finding number 9, the master disallowed the Owners credit for installing an icemaker, cleaning trash from the site, staining the inside of cabinets, repairing the intercom system, and for money paid to a subcontractor for making miscellaneous repairs. Regarding those items, without elaboration, the master noted that the Owners "failed to carry [their] burden of proof with respect to these items."

a. Installing an icemaker - $644.09

It is undisputed that an icemaker was not installed by the Contractor, and that the contract specifications provided for an icemaker to be installed. Fuller's August 22 letter notified the Contractor that it needed to "[i]nstall the icemaker with pump at the bar." Moreover, it is undisputed that the Owners purchased an icemaker on approximately September 24, 1983, for $644.09, and the Owners' check for that purchase was entered into the record.

The Contractor claims that, due to a mistake by the architect, the particular icemaker specified in the contract was not available at the time the house was being built. In its brief, the Contractor cites the testimony of James Varner to support their claim that "something else" was substituted in lieu of the icemaker. However, the testimony to which the Contractor refers pertains to a refrigerator, not an icemaker. Furthermore, when questioned about whether his company had installed the icemaker, James Varner replied, "I don't believe that was done." Thus, we find no material evidence to support the master's finding, adopted by the chancellor, that the icemaker was provided to the Owners. Consequently, the $644.09 cost of this item should be credited to the Owners.

b. Cleaning trash from the site - $200

In the proceedings before the master, the Owners asserted that the Contractor did not clean up the site, and the testimony of James Varner was consistent with that assertion. The Owners submitted into evidence photographs of the trash and debris that remained outdoors on the project site after most of the construction had taken place. The record also includes a check for $200 from the Owners to Bobby Smith for cleaning up the site. The Contractor contends that it was unable to clean up the site because James Varner was prohibited from entering the property after the "fist fight" in July 1983. It is undisputed, however, that Brooks Varner was never prohibited from

-12-

entering the property. He testified that, after the incident, he and other employees of the Contractor entered the premises to try to resolve the issues raised in the August 22 letter. There is no allegation that Brooks Varner, on behalf of the Contractor, was unable to perform the necessary clean up. The clean-up task was listed in the August 22 letter as an item that should have been done by the Contractor. Under these circumstances, we conclude that there is no material evidence to support the disallowance of this item. Thus, the Owners should be credited $200.

### c. Staining inside of cabinets - $1,300

The Owners claim that the Contractor was responsible for having the inside of the cabinets stained, and attributed an estimated cost of $1,300 to this task. The August 22 letter specifically listed "[c]omplete cabinets" as one of the defects to be corrected. However, the Owners submitted only the testimony of David Marrs on his estimate for the item, with no indications of the specifications for the task or evidence corroborating Marrs' estimate. The master found that the Owners had not carried their burden of proof on this item and, accordingly, disallowed it. We cannot conclude that there is no material evidence to support the mater's conclusion, adopted by the chancellor.

### d. Repairing intercom system - $392.70

It is undisputed that the Contractor had an intercom system installed, and that the intercom system did not work properly when the Contractor left the job. The August 22 letter listed "[i]nstall intercom system in livingroom" as unfinished business. David Marrs testified that he hired Acme Sales Company to repair the intercom, and that he paid them $392.70 for that work. However, the record contains no evidence about the reason the system malfunctioned. The Owners did not submit any corroborating evidence, such as a canceled check or invoice, regarding the amount paid, to whom it was paid, and the service that was performed. Under these circumstances, we find that there was material evidence to support the master's decision to disallow this item for lack of proof.

### e. To Himmer for completing items on punch list - $1,563.36

This claim is based on two payments made by the Owners to Roy Himmer totalling $1,563.36, allegedly for his efforts to complete items that needed to be finished on the house. However, the record contains no evidence of what tasks were performed by Himmer, and whether those tasks were the responsibility of the Contractor or the Owner. Himmer did not testify, and the record includes no bill to show what work Himmer performed. Consequently, we find that there was material evidence to support the master's decision to disallow this item for lack of proof.

### *Objection to finding number 14*

In query number 14, the master was asked about the defects in workmanship attributable to the Contractor. The master listed sixteen defects that were alleged by the Owners, but he disallowed each of those claims "based on the Application and Certification for Payment signed by the architect

(Application #16) on 6/10/83 . . . which indicates that the project was substantially complete and from the architect's punch list . . . which does not show these items; the Defendant also did not carry [their] burden of proving damages" with respect to the sixteen items.[4] The Owners claim that the master erred in disallowing some of these claims, and also in neglecting to mention their claims for repairing a heat pump ($743.90) and for waterproofing materials ($54.24).

### a. Undisputed Items

The evidence is undisputed that the Owners incurred expenses in repairing solar panels, repairing the skylight leak, and installing an exterior door. The evidence is also undisputed that these items were the responsibility of the Contractor. It appears that the master's only basis for disallowing the Owners their expenses related to curing these defects was the fact that the defects were not listed in the August 22 "punch list." As noted above, the master did not specifically find that the August 22 letter was intended to be an exhaustive list of defects. Consequently, where it is undisputed that the defect exists and that the expense for remedying the defect is necessary, the omission of a defect from the August 22 letter is not relevant. There is no other material evidence to support the conclusion of the master and chancellor to disallow these items. Therefore, we must reverse with respect to the following: (1) repair of solar panels, $378.87; (2) repair of skylight leak, $500.58; and (3) failure to pay for door, $152.97. Accordingly, the Owners should be credited $1,032.42 for curing those defects.

### b. Repair roof leak and waterproofing materials - $250.00 and $54.24

David Marrs testified that he paid Kermit Buck $250 to repair the leak in the roof and paid Styro Floral $54.24 for waterproofing material related to that repair. The evidence shows that the check to Buck was written on January 8, 1985, and the waterproofing material was purchased in November of 1984. According to the contract, if "within one year after the Date of Substantial Completion of the work . . . any of the Work is found to be defective or not in accordance with the Contract Documents, the Contractor shall correct it promptly after receipt of a written notice from the Owner." The roof leak was not included as an existing defect in the August 22 letter. Further, there is no evidence that this defect was found within the year after substantial completion, nor is there evidence that the Contractor ever received notice of this defect. Under these circumstances, we find that there was material evidence to support the master's conclusion that the Owners failed to sustain their burden on this claim.

4. Honeycombs in concrete exterior walls - $8,300; honeycombs in concrete interior walls - $4,609.

---

[4]These include several items previously discussed in this Opinion, such as the icemaker that was not furnished, trash on the site, the payments to Himmer for completing the "punch list," repairing the intercom system, and the cabinets that were not stained.

The Owners claim that the Contractor was responsible for curing defective lines, called "honeycombs," in the exterior concrete walls. The evidence is undisputed that the Contractor discontinued work on the job without completely repairing those walls, even though it had stated in a letter dated April 11, 1983 that it would patch the concrete "at an appropriate time prior to the job being considered 'substantially complete' and in compliance with the contract." This defect is not listed in the August 22 letter as being important for substantial completion, but Fuller testified before the master that some of the honeycombing on the exterior walls was "horrible." He suggested that the best way to cure the defect would be to pour concrete over the existing wall, which he estimated would cost approximately $8,300. No formal quote was submitted into evidence.

With respect to the interior walls, Fuller testified before the master that the walls were "obviously defective" because of honeycombing and discoloration, and that it would cost $4,609.00 to remedy the defects. The Owners submitted no photographs of the inside walls, nor was any formal estimate obtained to support their position.

The evidence submitted to the master on this is disputed regarding the appropriate remedy for honeycombs; there was testimony that pouring concrete over the wall would be best, and other testimony that patching the walls would be the most appropriate remedy. The record contains no evidence of the cost of patching. Moreover, despite Fuller's testimony on the severity of the honeycombing, the defects were not listed in his August 22 letter. Under these circumstances, there is material evidence to support the conclusion of the master and the chancellor that the Owners failed to carry the burden of proof on these items.

5. Repair defects in concrete floor - $32,544.25

David Marrs testified that the concrete floors were to be scored after pouring, forming two foot squares resembling a checkerboard across the room. When the floor was colored and waxed, it was to look like marble or some other type of inlaid floor. Both Marrs and Fuller testified that the job was defective because the Contractor allowed the concrete to harden too much prior to the scoring, and as a result the workers chipped the floor rather than cutting smooth, even lines. They attempted to patch the floor, but the patching allegedly caused discoloring and damaged flooring. Fuller estimated that the cost to repair this defect would be $32,544.25, because a whole new layer of floor would need to be poured and rescored.

At the hearing before the master, no photographs were submitted to illustrate how the floors were defective, and there was no formal estimate from a contractor who would perform such a task. As with the walls, Fuller did not list this large-ticket item in his August 22 letter, and therefore at that time must not have found the defect to have been critical to achieving substantial completion. That omission is inconsistent with his later testimony that the floors needed a complete overhaul. Under these circumstances, we find that there is material evidence to support the disallowance of this claim for repair.

6. Repairing heat pump - $743.90

The Owners claim that they paid Diamond Services $743.90 between January and May of 1985 to repair the heat pump in the house. David Marrs testified that he paid a total of $716.91 for this purpose, and there is some discrepancy between the testimony and the documentary evidence. From the record, it appears that this expense was incurred after the one-year period, and the Contractor received no notice of this defect prior to one year after substantial completion. Moreover, this defect was not among those listed in the August 22 letter. Consequently, we find that there is material evidence to support the conclusion of the master and the chancellor that the Owners failed to sustain their burden of proof on this claim.

In sum, the assessment of the total amount due to the Contractor in this case is modified to the following:

| | | | |
|---|---|---|---|
| Contract Sum | | | $328,000.00 |
| Change Orders | | | 30,700.00[5] |
| Total | | | 358,700.00 |
| Less: | Payments (Application No. 16) | $313,868.00 | |
| | Payments allowed to Owners | | |
| | Cleaning of Skylight (Finding 9) | 392.00 | |
| | Gold Mirror | 1,650.00 | |
| | Icemaker | 644.09 | |
| | Clean up trash | 200.00 | |
| | Repair solar panels | 378.87 | |
| | Repair skylight leak | 500.58 | |
| | Door | 152.97 | |
| | Payments to Subs (Finding 10) | 19,789.00 | 337,575.51 |
| | | | |
| Total Due Contractor | | | $21,124.49 |

As a final matter, both parties dispute the chancellor's award of prejudgment interest. Generally, the appellate court will not overturn a trial court's finding of prejudgment interest unless the trial court has abused its discretion. *Alexandar v. Inman*, 974 S.W.2d 689, 698 (Tenn. 1998).

The chancellor awarded the Contractor a flat amount of $12,000 in prejudgment interest, "taking into consideration the fact that the case has been pending for approximately 17 years and that the Special Master had the matter under advisement for 7 years. The Court feels that the defendants should not be taxed with interest during the entire period the suit was pending."

The Contractor argues that the chancellor erred in limiting the prejudgment interest to $12,000, because the AIA Contract provides specifically that "[p]ayments due and unpaid under the Contract Documents, shall bear interest from the date payment is due . . . ." AIA Contract ¶7.8.

---

[5] This total amount of change orders is consistent with the master's finding number 2. Apparently, the change order amount was mistakenly listed as $27,887 in the master's finding number 20.

Instead, the Contractor claims, the trial court should have awarded prejudgment interest from the date the payments were due, approximately seventeen years prior, which would amount to approximately $39,000 in this case. Where prejudgment interest is provided for in a contract, the Contractor argues, that provision must be enforced without weighing any equitable considerations. Because the contract in this case included a provision regarding interest due on unpaid debts, the Contractor urges this Court to find that the provision requires an award of prejudgment interest "from the date payment [was] due." AIA Contract ¶7.8.

The Owners argue on appeal that the chancellor erred in awarding any amount of prejudgment interest. They argue that the contractual provision cited by the Owners is not applicable, and that Tennessee Code Annotated § 47-14-123 governs the award of prejudgment interest in this case. That statute provides in pertinent part:

> Prejudgment interest . . . may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . . . In addition, contracts may expressly provide for the imposition of the same or a different rate of interest to be paid after breach or default within the limits set by § 47-14-103.

Tenn. Code Ann. § 47-14-123 (2001). Under that statute, the Owners argue, prejudgment interest should be awarded "in accordance with the principles of equity," and the equities in this case weigh in favor of disallowing any interest because the Contractor's right of recovery was disputed on reasonable grounds. *See Alexander*, 974 S.W.2d at 698 (stating that prejudgment interest is more likely to be equitable if plaintiff's right of recovery is not disputed on reasonable grounds).

This Court has held that the equitable considerations referred to in Tennessee Code Annotated § 47-14-123 are applicable in a construction dispute, even where the contract involved contains a provision regarding interest accrual on unpaid debts arising out of the contract. *Southwest Progressive Enters., Inc. v. Shri-Hari Hospitality, LLC*, No. 01-A-01-9810-CH-00542, 1999 Tenn. App. LEXIS 603 (Tenn. Ct. App. Sept. 1, 1999). In *Southwest Progressive Enters.*, the plaintiff contractor sued the owner/developer of a hotel project for amounts due on a contract in which it had agreed to texturize the walls in eighty-five (85) rooms of the hotel. The contract between the parties "provided that payments due and unpaid under the contract would accrue interest at the rate of 10% per year." *Id.* at *2. The trial court found in favor of the contractor and awarded prejudgment interest. On appeal, the owner argued that the trial court erred in awarding prejudgment interest because the obligation to award such interest never arose under the specific terms of the contract. In rejecting the owner's argument, the appellate court noted that "[i]t has long been the law in Tennessee that courts may award pre-judgment interest in accordance with the principles of equity." *Id.* at *4. The Court noted that the owner's contractual argument did "not address the equitable purpose of awarding prejudgment interest, which is 'to fully compensate a plaintiff for the loss of use of the funds to which he or she was legally entitled.'" *Id.* at *5 (quoting *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994)). The appellate court concluded that it would have been inequitable to reward the owner for refusing to pay by allowing it free use of the contractor's money.

-17-

In this case, we find that the chancellor was entitled to weigh the equities in determining the appropriate amount of prejudgment interest. The provision in the contract regarding interest applies to "[p]ayments due and unpaid under the Contract Documents." AIA Contract ¶ 7.8. The amounts "due and unpaid" were the subject of much dispute. We have recognized that a trial court has the power to award prejudgment interest "in accordance with the principles of equity." *Southwest Progressive Enters.*, 1999 Tenn. App. LEXIS 603, at *4. On this basis, we find that the chancellor did not err in refusing to hold the Owners liable for prejudgment interest at a rate of 10% for the entire duration of this controversy.

We also reject the Owners' argument that the chancellor should not have awarded any prejudgment interest. The Owners claim that prejudgment interest was inappropriate in this case because their obligations were disputed on reasonable grounds. While the fact that an obligation is reasonably disputable is a factor in determining whether prejudgment interest is warranted, a court is not bound to deny prejudgment interest in such cases. *See Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 928 n.7 (Tenn. 1998) (overruling those cases which hold that prejudgment interest is not allowable when an obligation is disputed on reasonable grounds). Rather, the court has "considerable deference in the prejudgment interest decision." *Id.* at 927. Trial courts are guided by several principles in determining an appropriate amount of prejudgment interest. A court must consider principles of equity, and it must also bear in mind that the purpose of making such an award "is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Id.* Also, prejudgment interest should be granted "when the amount of the obligation is certain," and where "the amount is not disputed on reasonable grounds." *Id.*

The chancellor in this case found that the equities weighed in favor of awarding prejudgment interest, but he also concluded that the extraordinary duration of these proceedings required that such interest be limited. It was within the equitable power of the chancellor to consider the unusual duration of this litigation as a factor in reducing the prejudgment interest so as to prevent unjust punishment to the Owners. *See Foster & Creighton Co. v. Wilson Contracting Co.*, 579 S.W.2d 422, 428-29 (Tenn. Ct. App. 1978) (affirming trial court's disallowance of prejudgment interest against defendant when case endured twenty (20) years and claim was one for unliquidated damages). Because the amount of the damages award has not been greatly modified on appeal, we affirm the award of prejudgment interest in the amount of $12,000.

Accordingly, we affirm in part, reverse in part, and modify. The cause is remanded to the trial court for further proceedings consistent with this Opinion. Costs are to be taxed equally to the appellants, David M. Marrs and Latitia M. Marrs, and their sureties, and appellees, Varner Construction Company and The Estate of Brooks Varner, for which execution may issue if necessary.

_____

HOLLY K. LILLARD, JUDGE