IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 23, 2004 Session

**RHONDA LEIGH JONES ROBINSON**
**v.**
**RUSSELL RAYNOR ROBINSON**

**An Appeal from the Circuit Court for Shelby County**
**No. CT-00-3852      James F. Russell, Judge**

---

**No. W2003-01836-COA-R3-CV - Filed May 9, 2005**

---

This is a divorce case about dissipation of marital assets and custody. Throughout the marriage, the wife took care of the children while the husband provided financial support. The husband was the owner and operator of several automobile businesses. After the wife filed for divorce, the husband's automobile businesses failed, resulting in the husband's father purchasing the businesses. After a lengthy trial, the trial court found that the husband intentionally dissipated marital assets, including the automobile businesses. The wife was designated the children's primary residential parent. The husband appeals. We affirm, finding that the evidence supports the trial court's finding that the husband dissipated the businesses by failing to preserve them, and the designation of the wife as primary residential parent.

**Rule 3 Appeal; Judgment of the Circuit Court is affirmed and remanded**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

David E. Caywood and Holly J. Renken, Memphis, for Defendant/Appellant Russell Raynor Robinson

Stuart B. Breakstone and Zachary M. Moore, Memphis, for Plaintiff/Appellee Rhonda Leigh Robinson

**OPINION**

Russell Raynor Robinson ("Husband") and Rhonda Leigh Jones Robinson ("Wife") married on August 16, 1991. This was the first marriage for both parties. Together, they had four children:

Taylor Brooke, born on December 4, 1993, Austin Raynor, born on May 22, 1995, Mackenzie Leigh, born on June 20, 1997, and Reagan Grace, born on June 3, 2000.

Both parties graduated from college but Wife never held a full time job. Wife's only work experience was as a part-time model. Wife took charge of caring for the children and the household, while Husband earned money to support the family.

After the parties married, they moved to Austin, Texas, where Husband worked as a sales representative. In 1995, the parties moved to Memphis so that Husband could work for his father, Mack Robinson ("Grandfather").

At that time, Grandfather owned a retail automobile dealership that sold used automobiles. The dealership marketed to clients with poor credit history and financed loans for these customers. For approximately eighteen months, Husband worked as a sales manager at Grandfather's automobile dealership, until the dealership went out of business. After Grandfather's dealership went out of business, Husband continued to work for him for a time collecting receivables.

In late 1996, Husband started his own automobile wholesale business, called Southern Wholesale. He utilized $20,000 he obtained from Grandfather in order to start the business. Husband characterized this as a loan, although there were no written documents designating it as such or indicating a schedule for repayment.

At first, Husband operated Southern Wholesale from his home as a sole proprietorship. The business consisted of buying used automobiles at wholesale auctions, and then reselling them to local automobile dealerships. Initially, Husband used cash advances from credit cards to fund the purchase of the automobiles. Later, in order to further fund the purchase of automobiles, Husband obtained a loan from Trustmark Bank and lines of credit from Tipton Bank and Trust, Automotive Finance Corporation, and Mannheim. Southern Wholesale was later incorporated, with Husband as the sole shareholder, and its operations were moved out of the parties' home.

In addition to Southern Wholesale, in October 1999, Husband opened a retail automobile dealership in Memphis, Tennessee, called Covington Pike Auto Depot. Employees Fred Kratt and Randy Odom were hired to manage the dealership. In 2000, Husband opened a second retail dealership in Memphis on Mt. Moriah with partners Tom Lockaby and Jim Whittington. This second retail store was a Thrifty franchise, and Covington Pike Auto Depot became a Thrifty franchise at the same time. In the spring of 2001, Husband opened a third Thrifty retail automobile dealership in Jonesboro, Arkansas. In late 2000, Kratt left and Husband's employee, Pug Vickers, was hired as manager for all three Thrifty retail locations, and additional employees were hired to help with operations.

The three retail locations acted as sales outlets for Husband's automobile wholesaling business. Southern Wholesale bought used cars at auction, then delivered them to the retail operations. The retail operations sold the cars to customers and then paid Southern Wholesale the wholesale cost of the automobiles, plus a profit.

As compensation, Husband took draws from Southern Wholesale, and later a regular salary from Southern Wholesale and at least one of the retail dealerships. In addition, numerous personal expenditures were funded through Southern Wholesale. Southern Wholesale helped fund items such as the purchase of an airplane, a substantial portfolio of stock, and improvements to the parties' second home on Pisgah Road and the thirty-three acres adjacent to it.

The business generated substantial monies. During the years 2000, Husband had an adjusted gross income of $1,790, 316. Husband spent considerable time trading stocks, with a volume of $5,747,544 in stock trades in 2000.

In time, the parties' marriage encountered difficulties. In early 2001, the parties participated in counseling, making separate weekly trips to Texas to meet with a psychologist. These efforts proved unsuccessful.

On March 20, 2001, Southern Wholesale paid Grandfather $12,500. This was characterized as a partial repayment of the $20,000 Grandfather had given Husband in November 1996 in order to start his wholesale automobile business, Southern Wholesale.

On June 22, 2001, Wife filed a complaint for divorce, alleging inappropriate marital conduct as grounds. On the same day, the trial court enjoined Husband from "spending, transferring, conveying, destroying, loaning, selling, concealing, secreting, trading, disposing of or dissipating the parties assets, except as needed for ordinary, necessary and reasonable living expenses." In the complaint for divorce, Wife sought custody of the children, child support, alimony, attorney's fees, and an equitable division of marital property. The parties separated in early August 2001.

In July of 2001, Husband obtained a $3.5 million loan from First Tennessee Bank. The proceeds of this loan were to be used in part to pay off the prior loans and lines of credit from Trustmark Bank, Tipton Bank and Trust, Automotive Finance Corporation and Mannheim, totaling approximately $1 million. In connection with this loan, First Tennessee requested financial statements from Southern Wholesale, Husband's personal tax returns, and a statement of Husband's net worth. Husband's net worth statement showed personal net worth in excess of $3 million at that time.

First Tennessee also required collateral for the loan. The business assets of Southern Wholesale were pledged as collateral, as well as Husband and Wife's personal assets, including the 33 acres of land on Pisgah Road and a securities account. The combined value of Husband and Wife's personal assets was approximately $700,000.

In addition, Grandfather guaranteed the $3.5 million loan with First Tennessee, and pledged two parcels of real property as collateral for his son's loan. In a side agreement not disclosed to First Tennessee, Southern Wholesale agreed to pay Grandfather a "guarantor fee" of $10,000 per month. Husband was frequently permitted by Grandfather to endorse and cash the $10,000 monthly fee ostensibly paid to Grandfather as guarantor.

In July 2001, Husband hired James Butler as manager of Southern Wholesale and the Thrifty retail stores. Butler reviewed the books and management practices for the retail stores and Southern Wholesale.

On July 9, 2001, after Husband received the loan from First Tennessee, Husband gave Grandfather the second installment of $12,500 as repayment from the 1996 loan, plus an additional $5,000. On August 1, 2001, Husband also wrote Grandfather a check for $5,000, but Husband was permitted to keep the proceeds of that check.

In August 2001, in connection with the parties' August 15 wedding anniversary, Husband planned an extravagant weekend trip for him and Wife, as an attempt to reconcile. He chartered an airplane at a cost of $8,000, planned dinner on a yacht in Florida at a cost of $12,000, reserved a room at the Ritz Carlton at a cost of almost $4,000, and paid a travel agency $4,000 for making the arrangements. These expenses were paid through Southern Wholesale. Wife refused to go on the trip.

In August 2001, the trial court appointed Stephanie Micheel ("Micheel") to act as guardian ad litem on behalf of the parties' children, to investigate parenting issues. The trial court also appointed a psychologist, Dr. John Ciocca ("Dr. Ciocca") to perform psychological evaluations of both parties.

In September 2001, Husband drew approximately $597,000 from Southern Wholesale. This was used to pay Husband's outstanding personal income taxes.

In October 2001, in response to Wife's petition to have Husband pay her interim attorney's fees, Husband submitted an affidavit by employee James Butler regarding the financial condition of Southern Wholesale and the three retail automobile sales locations. The affidavit stated:

> 4. As of October 16, 2001, [Husband's automobile dealerships] were in a deficit situation with a negative cash flow as follows:
> (a) Southern Wholesale, Inc.: ($70,796.00)
> (b) Covington Pike Auto Depot: ($145,789.16)
> (c) Mt. Moriah Auto Depot: ($350,562.99)
> (d) Thrifty Auto Sales of Jonesboro: ($237,522.60)
> 5. Sales for each of the four companies are currently 25% to 40% lower than they were thirty (30) days ago.
> * * *
> 11. The four companies owned by [Husband] are in a desperate financial situation and, without a large infusion of capital in the near future, will likely not survive.

Husband filed his own affidavit as well, claiming that he held virtually no unencumbered assets, that his automobile businesses were "holding checks in the approximate amount of $800,000.00 that cannot be paid to vendors and creditors due to a lack of funds." Husband asserted in his affidavit that he owed First Tennessee Bank $2,492,070, and that "all of my personal and business assets are

pledged as security for the loan from First Tennessee Bank and therefore cannot be liquidated or further encumbered."

Shortly after this, in November 2001, Husband filed his answer to Wife's complaint for divorce, as well as a counterclaim for divorce, citing inappropriate marital conduct by Wife. In the counterclaim, Husband sought custody of the parties' four children.

In November and December 2001, Husband and James Butler contacted officials of First Tennessee Bank ("Bank") in order to meet with them. In the meetings, Husband and Butler informed the Bank officials of the bleak financial condition of Husband's businesses, consistent with the affidavits submitted to the trial court. Not surprisingly, the Bank officials were concerned about the status of Husband's substantial loan. Thereafter, in December 2001, Grandfather contacted the Bank as well, in connection with his guaranty of Husband's loan, and met with Bank officials about the financial circumstances of Husband's businesses. Grandfather's understanding at that time was that Husband's automobile businesses were "out of trust"[1] approximately one million dollars with First Tennessee Bank. Grandfather told the Bank officials that he planned to purchase the loan, in order to essentially step into the shoes of First Tennessee Bank and become a creditor to Husband and his businesses. Father did not attend Grandfather's meeting with Bank officials.

Thereafter, in February 2002, First Tennessee Bank notified Husband that the loan was in default status. At the time Husband received this notice, Grandfather was already in the process of acquiring funding and necessary approval to purchase First Tennessee Bank's position.

In the approximately two-month period it took for Grandfather to complete his purchase of the First Tennessee loan, between January 29, 2002 and March 22, 2002, Southern Wholesale engaged in the following transactions: (1) paid Jim Butler $75,000; (2) paid Husband's divorce attorney $22,500; (3) paid $3,480 to Husband's prior divorce attorney; (4) paid $30,000 to Grandfather as guarantor fees; (5) paid $35,261 to Pug Vickers, Husband's former employee, (6) paid $37,400 to other prior attorneys. These transactions totaled $203,641.

After the First Tennessee loan was called, the property pledged as collateral was subjected to foreclosure and liquidation procedures. The collateral included property belonging to Husband and Wife, including the 33 acres on Pisgah Road, their stock portfolio, and their vehicles. After this, the balance owed to First Tennessee was approximately $1,088,000. Grandfather secured a loan in this amount to purchase First Tennessee's position. Grandfather then liquidated the remaining assets of the auto businesses, including the automobiles, which resulted in a deficiency balance of $167,894.

---

[1] The phrase "out of trust" is used frequently throughout the trial proceedings in connection with the First Tennessee Bank loan. In this context, the term means that automobiles are purchased with borrowed funds; the borrower is expected to repay the borrowed funds to the lender when the cars are sold or within a given length of time. When this is not done, the borrower is "out of trust."

Grandfather then sued Husband for the deficiency balance, plus pre-judgment and post-judgment interest, plus attorney's fees of $41,973.50. Husband filed no response to Grandfather's collection suit, and as a result, Grandfather took a default judgment against him.

In the midst of this, in January 2002, Grandfather opened a wholesale automobile business and a retail automobile business. Jim Butler, although still employed by Husband, set up Grandfather's automobile businesses. Grandfather's retail automobile business subleased the location of Husband's Covington Pike Auto Depot in Memphis. Grandfather hired Jim Butler and Husband to run the new automobile businesses, utilizing the fixtures and equipment that had belonged to Husband's businesses, and many of the same employees.

Meanwhile, after the parties separated, they agreed that their four children would spend equal parenting time with Husband and Wife, pending resolution of their divorce. The guardian ad litem, Micheel, investigated matters related to the children, including interviews with the children, the parties and other persons with knowledge. The guardian also investigated the parties' allegations against each other as they related to the children, such as drug use, paramours in the presence of the children, and deficiencies in parenting. During this time as well, Husband employed a private investigator to investigate Wife.

The parties engaged in settlement negotiations, to no avail. In May 2002, Grandfather intervened in the parties' settlement negotiations, sending Wife's attorney a letter. Grandfather's letter stated: "I am not happy with how things are proceeding with [Father] and all of the divorce issues, so, as a result I am making the following offer to assist in the final asset and alimony statement of this divorce." The letter listed the terms of the settlement offer, indicating that he would bring the parties' mortgage current and pay various other of the parties' obligations, provided that Wife agreed that Husband would receive a minimum of equal parenting time. The letter showed the words "accepted & agreed" handwritten across the bottom and was signed by Wife and counsel for Husband.[2] Thereafter, attorneys for the parties exchanged letters in an unsuccessful attempt to finalize the agreement.

After the parties failed to reach a final settlement, Husband took the position that Grandfather's original letter, "accepted and agreed" by the parties, constituted a final settlement of all of the divorce proceedings. He filed a Petition to Enforce Settlement Agreement on July 7, 2002 in an attempt to enforce the terms of Grandfather's letter. In an order dated November 1, 2002, the trial court denied Husband's motion to enforce Grandfather's letter as a settlement agreement, finding "that there is no basis to enforce the Settlement Agreement because it is void due to it missing certain essential elements and, therefore, it is unenforceable." Therefore, the matter proceeded to trial.

The trial commenced on February 24, 2003. It lasted over two weeks and generated an extensive record. In addition to the parties and Grandfather, numerous witnesses testified, primarily regarding Husband's business and financial dealings, and also regarding parenting issues.

---

[2] The letter has other illegible markings that may be other signatures. This was not an issue in the case.

Husband testified that the financial difficulties in his automobile businesses stemmed from his lack of knowledge and experience, and from the fact that he hired and trusted a series of managers who did not serve him well. He said that, before opening his three retail locations, he had never run a retail business before; he had only worked in his father's retail automobile dealership. He had no business plan and no professional advice. He hired Fred Kratt and Randy Odom and relied on them completely. Likewise, when he partnered with Tom Lockaby and Jim Whittington to open the Mt. Moriah retail location, and when he hired Pug Vickers and opened the Jonesboro location, he relied on them completely and never sought advice from a seasoned retail store operator. Husband asserted that, prior to Wife filing for divorce, he did not realize the poor financial condition of his businesses, and how his employees had exploited him. He noted that he ended up in disputes with Pug Vickers and Randy Odom that were settled, and that Fred Kratt had a lawsuit pending against him. Husband asserted that he did not discover the poor financial condition of his businesses until he hired James Butler in July 2001, after Wife's complaint for divorce was filed.

Husband explained that his business, Southern Wholesale, would pay Grandfather a fee of $10,000 per month for guaranteeing the First Tennessee loan, and Grandfather would loan Husband this money by permitting Husband to cash the checks from Southern Wholesale, in exchange for a promissory note. Husband utilized this money to hire private investigators to follow Wife. Through the private investigator, Husband learned that, after the parties separated, Wife began a romantic relationship with Mitch Wood.

Husband acknowledged that, prior to the parties' separation, Wife was primarily responsible for the care of their children, and that he spent the majority of his time occupied with work. After the parties separated and temporarily agreed that each would spend a week with the children, Husband said, he had spent considerable time with them and had developed an excellent relationship with the children.

Husband was asked about the documentation given to First Tennessee Bank in order to obtain the $3.5 million loan, and in particular his personal statement of net worth indicating a net worth of over $3 million. Husband testified that when he delivered the statement of net worth to First Tennessee, he verbally informed them that the stated net worth was offset by recent loans totaling $1.5 million, and that First Tennessee did not require him to add those loans to his written statement of net worth. Husband asserted that he did everything he could to save his businesses, but ultimately was unsuccessful.

In her testimony, Wife described Husband prior to the parties' separation as having worked virtually all day; after he came home in the evenings, he would continue to work on the telephone or on his computer. She said that Husband seldom interacted with the children, was rarely affectionate toward them, and took no responsibility for their care. She said that she agreed to an alternating week schedule on a trial basis because the children craved attention from their father. However, she felt that it was no longer working, that the children were uncomfortable being at their father's house and away from her for such a long period of time.

Wife described Husband as demanding and controlling. She said that he did not discuss financial matters with her except to give her an allowance from which to pay the household bills. Wife testified about an earlier occasion in October 2000 when Wife attempted to leave Husband. Wife said that Husband took the children and told her she would never see them again if she did not return. She said that Husband glued the locks to the house shut in order to keep her out, and threatened to take the children, tie bricks to her ankles and throw her into the Mississippi River.

Wife said that she told Husband that she had become involved with Mitch Wood. After that, she said, she was aware that Husband had private investigators follow her and Wood. Wife said that the private investigators did not try to hide; her home was under constant surveillance and they followed her wherever she went. Wife described an occasion on which she and Wood were having dinner at a restaurant late one weekday night while the children were in Husband's care. Husband brought the parties' four children to the restaurant, ostensibly for a late dessert, and sat down at the table next to Wife and Wood.

The guardian ad litem, Micheel, testified about her investigation and her discussions with the children. She reported that the drug tests taken by the parties were negative. She described the children as uncomfortable with some aspects of Husband's care, such as his disciplinary methods and the fact that he sometimes screamed at them, and said that they had difficulty becoming accustomed to being around Husband so much because he had not spent much time around them before the parties separated. Micheel noted that Husband had failed to maintain a land line telephone at his home, so the children had to use his cell phone to call their mother, which meant that the children were sometimes unable to call her. One child told Micheel privately that she did not want to hurt Husband's feelings, but she just did not want to spend as much time at Husband's home.

The psychologist, Dr. Ciocca, testified about the results of his psychological evaluations of Wife and Husband. Dr. Ciocca stated that Wife's mental status was within normal limits. Dr. Ciocca concluded that Husband "has the symptoms of a personality disorder with narcissistic, dependent, and antisocial features." He described these conditions as "an individual who has a tendency to be more concerned about his own well-being than that of those around him" and "a person who characteristically tends to be manipulative, to be inclined to be dishonest or deceitful when it meets his or her goals and who doesn't necessarily have a great deal of anxiety or concern about the fact that they are breaking the rules."

Grandfather testified as well. Grandfather testified that his understanding was that, prior to June 2001, Husband's businesses were doing well. He said that, in December 2001, he received a telephone call from James Butler, whom he had never met, informing him that Southern Wholesale was out of trust with First Tennessee by approximately a million dollars. Grandfather said he did not at that time discuss the situation with his son; rather, he and Butler went to meet with First Tennessee Bank officials regarding the loan which Grandfather had guaranteed. In December 2001, prior to First Tennessee's foreclosure on Husband and Wife's assets, Grandfather decided to purchase the loan, to step into First Tennessee's shoes and become a creditor of Husband.

At that time, Grandfather began preparations to open similar automobile wholesale and retail businesses, subleasing space that had been used by Husband's businesses. James Butler assisted Grandfather in setting up his new businesses, while Butler was being paid by Husband's businesses. Thereafter, Grandfather hired Husband, Butler, and other employees of Husband's defunct businesses. Grandfather said that he was unaware of the payments made by Southern Wholesale to Butler and Husband's attorneys and former employees, and acknowledged that these amounts would have reduced the balance he had to pay to First Tennessee. After he acquired Husband's businesses by purchasing the loan, Grandfather said, he never reviewed the books to determine what caused them to fail.

Grandfather stated that he sued Husband, in part, to prevent other creditors from gaining access to Husband's assets. When asked if Wife would have been one of those creditors, Grandfather replied, "I never looked at it in that light, but that would be true." Grandfather acknowledged paying between $45,000 and $75,000 in Husband's litigation expenses for the divorce proceedings.

Fred Kratt ("Kratt"), one of Husband's former employees, testified at the trial. Kratt alleged that Husband, despite a prior agreement, refused to sign over stock in the companies and a dispute arose between them. Kratt testified that when he pressed Husband for the stock, Husband responded "that he could close the place down, bankrupt it, shut it down, reopen it under another corporation name and I would get nothing."

Kratt described Husband as very sharp, detail-oriented and driven to acquire money. At dinner one night, Kratt said, Husband commented that he did not love what money could buy, but rather, "I love money more than what it can buy. I want money."

Kratt testified that, prior to the parties' separation, Husband placed a recording device on their home telephone and a GPS device on Wife's vehicle, in order to record Wife's telephone conversations and track her activity. After Wife filed for divorce, Kratt said, Husband assured him that Wife would receive nothing in the divorce. Kratt described Husband as cold and uninvolved with his children.

Kratt described numerous types of transactions in Husband's automobile businesses in which a portion of the monies received were paid in cash and not recorded. He said that Husband attempted to enlist his help in getting Wife to resolve the divorce by persuading her that Husband's businesses were in financial ruin. Toward that end, he said, Husband showed him financial statements for his businesses, and when Kratt asked about specifics and supporting documentation, Husband professed not to know. Kratt had perceived Husband's businesses to be profitable, and was not persuaded.

James Butler ("Butler") testified in detail about his experience in the automobile business and his evaluation of the financial condition of Husband's businesses. Butler described the businesses as actually having been in poor financial condition at the time the First Tennessee Bank

loan closed, unbeknownst to Husband and to the Bank, since many of the problems stemmed from the dealings of the managers on whom Husband relied.

The day after the two-week trial concluded, the trial court issued a careful, detailed oral ruling. As an initial comment, the trial judge remarked that Grandfather's letter proposing settlement was an "intrusion" by one who was not a party, and "had an overall chilling effect" on the parties' settlement negotiations.

The trial court stated that the witnesses called on behalf of Husband, and Husband himself, lacked credibility. He observed that the credibility of Husband and his witnesses "has been impeached on point after point after point." Dr. Ciocca's evaluation of Husband as narcissistic, the trial judge stated, had come through in Husband's parenting, and even more so in his business and financial dealings.

On the issue of which party should be deemed the primary residential parent, the trial judge found that Husband had consistently demonstrated his desire to control and had regularly put his own needs ahead of the needs of his children. He noted one child's privately stated concerns about spending so much time with Husband. The trial judge observed that three of the parties' four children were daughters, and commented that "a teenage daughter needs the practical, emotional and nurturing guidance that only a full-time mother can give." Consequently, the trial court designated Wife as the primary residential parent and adopted Wife's proposed parenting plan.

The trial court then addressed the division of the martial estate. It found numerous non-business expenditures by Husband to be dissipation of marital assets. These expenditures included $25,000 to private investigators hired simply to harass Wife, overpayment of income taxes in the amount of $15,000 by filing separately instead of jointly, $2,750 paid to a prostitute, and the monies expended by Husband for the proposed elaborate anniversary "date" dinner on a yacht in Florida, after the parties separated and divorce was imminent. These dissipated assets totaled $59,038.68, and the trial court awarded half of that amount to Wife.

The trial judge next evaluated the issue of dissipation with respect to business assets. After emphasizing the lack of credibility of Husband and the witness called on his behalf, the trial court observed:

> The only credible statement from any witness came from Fred Kratt who said, Rusty Robinson is in Fred Kratt's words, quote, driven. He is driven by the love of money.
> The next incredible statement is equally important. That is, Rusty Robinson is recounted as having said, "If it comes to divorce, he would see that his wife got nothing."
> The Court is compelled to a conclusion that the greater weight of preponderance of the evidence weighs most heavily in favor of the wife's theory, that the husband not only failed to protect and preserve – there's that word again – the business and investments, but instead set in motion with the aid and assistance of his father, Mack

Robinson, a chain of events that was designed to destroy the automobile businesses for him and to obliterate the investments of the marital estate.

The trial judge traced in detail the timeline of Husband's financial decisions and the demise of his businesses. He found that, after Wife first attempted to leave Husband in October 2000 and the parties engaged in fruitless counseling, Husband set up the loan arrangement with First Tennessee Bank, pledging virtually all of the parties' assets and putting Grandfather in a position to assert a lien on those assets. The trial judge found that First Tennessee Bank would not have closed on the loan had the necessary documentation shown that the borrower, Southern Wholesale, was in "the kind of financial shape depicted by" Husband and his witnesses. The trial court specifically found unbelievable the affidavits and testimony of Husband and of James Butler that, less than two months after the First Tennessee loan closed, Husband's automobile businesses were in a "deficit situation" in the amount of approximately $800,000.

The trial court observed that, during this time, Husband withdrew $597,000 from his businesses to pay income taxes. It also noted that, as to Husband's stock trading account, "he had reached levels as high as $5 million plus during the year before; and he had cash available to put into these businesses."

The trial judge remarked that, in December 2001, Husband and Butler said that they contacted First Tennessee Bank to "disclose what they contend is a dire financial condition." And yet the loan was not declared in default by First Tennessee until February 28, 2002. It found that the record included no "empirical evidence" of the claim of financial straits, only "the self-serving testimony of witnesses whose credibility is more than suspect, and who say only that the businesses are in shambles and are, quote, upside down." The trial court also noted that, during this time, Grandfather was busily setting up his new auto businesses with no examination of the books and records of Husband's businesses. The trial court stated:

> Instead, he marched confidently along, using his son's employee, namely Jim Butler, at his son's company's expense to set up the corporate structure to replace Southern Wholesale, Inc., and the three Thrifty retail businesses at the same location with the same inventory; the same furniture, fixtures and equipment; and for the most part, the same employees, except for those with the exorbitant salaries, but including Jim Butler.
>
> Considering all of the evidence, the Court is compelled to the conclusion by a preponderance of the evidence that Russell Robinson and his father, Mack Robinson, participated in a well-devised and carefully orchestrated scheme to deplete this marital estate of its most valuable assets.
>
> Beginning in at least October, 2000, not only does Russell Robinson glue the locks on the doors of the house, he began draining the businesses of operating capital and failed or refused to reinvest the necessary capital to allow for successful operation, thus allowing for a collapse of the businesses, right into the waiting hands of his father, K. Mack Robinson.

Noting that dissipation of assets can include the failure to preserve marital assets, the trial judge found:

> The conclusion, based on the greater weight of the evidence, is clear. The husband absolutely failed in his duty under TCA 34-4-121(c)(5) to preserve and protect the automobile businesses, the 33 acres of land, and the securities accounts as assets that by all rights should still be a part of this marital estate for distribution by the Court.

The trial court found that the payments by Southern Wholesale to Grandfather were "nothing more than a ruse," and "a pass through for income back to" Husband. It appointed a special master to value the automobile businesses set up by Grandfather, finding:

> The Court is of the considered opinion that these new companies and businesses, set up by [Grandfather] in preparation for his take out, is in reality the alter ego of [Husband's] former companies.
>
> * * *
>
> In the end, depending upon what that evaluation turns out to be, 50 percent of that value will be charged to the husband and credited to the wife.

The trial court awarded Wife nine months of rehabilitative alimony, and ordered one of the parties' residences sold to pay Wife's attorney's fees. It found that Husband was under-employed, working for Grandfather, and imputed income based on 50 hours of work per week plus the $5,000 per month being drawn by Grandfather for no work, for a total gross income of $10,625 per month. Child support was set based on that imputed income.

Finally, the trial court found Husband in criminal contempt for his deliberate acts to deplete the marital estate, and ordered him to serve 30 days in jail. The trial court stated that if Husband were to "purge himself of all or any portion of his contempt," the trial court would consider suspending all or part of the jail sentence. When asked about the issue of civil contempt and setting a purge payment for Husband to obtain release from jail, the trial court said that it "determined that the record was devoid of sufficient evidence upon which the Court could make the finding and did not make that ruling. It was considered and rejected."

Subsequently, on April 4, 2003, the trial court entered a written order, declaring the parties divorced pursuant to Tennessee Code Annotated § 36-4-129, and incorporating its March 12, 2003 oral ruling. The trial court totaled the payments which were found to be dissipation by Husband and awarded Wife half, a total award to Wife of $456,351.80. This amount was credited to Wife as alimony *in solido*. The order stated that Wife would be awarded half of the value of Husband's former businesses, now owned by Grandfather, pending determination of the value by a special master. On June 9, 2003, this order was made final and appealable pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. From this order, Husband now appeals.

On appeal, Husband specifies fifteen separate issues to be considered by this Court. Husband's arguments, as restated by this Court, are that the trial court erred in its refusal to enforce the settlement agreement proffered by Grandfather; its determination that Grandfather "did something wrong" by sending the settlement offer to Wife; its finding that Husband traded securities accounts worth 5.7 million dollars in 2000 and 1.3 million dollars in 2001; its finding that Husband's 2000 income had vanished; its finding that Husband dissipated marital assets; its findings related to Husband's businesses; its grant of alimony *in solido*; its calculation of child support; its award of private school tuition for the children; its naming Wife as primary residential parent; its award of attorney's fees; and its finding Husband guilty of criminal contempt. In our analysis below, we have combined and grouped them according to topic when feasible to avoid repetition.

Our review of this case is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure, which provides that review of findings of fact by the trial court shall be *de novo* upon the record of the trial court, accompanied by a presumption of correctness of the factual findings, unless the evidence preponderates otherwise. T.R.A.P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

The presumption of correctness applicable to a trial court's findings of fact pursuant to T.R.A.P. 13(d) applies to child custody. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Whitaker*, 957 S.W.2d at 838. Further, a trial court is granted wide discretion in a child custody case because the judge "enjoys a substantial advantage in having the opportunity to see, hear and evaluate the parent's suitability as custodians." *Herrera v. Herrera,* 944 S.W.2d 379, 385 (Tenn. Ct. App.,1996) (quoting *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn. Ct. App.1989)). A reviewing court will not interfere with the trial court's decision except upon a showing of abuse of discretion. *Id.*

A trial court is afforded wide discretion when dividing the marital property, and its distribution will be given "great weight" on appeal. *See Ford v. Ford*, 952 S.W.2d 824, 825 (Tenn. App. 1997). Factors to be considered in the equitable division of marital property are set forth in Tennessee Code Annotated § 36-4-121.

The trial court is afforded discretion concerning whether to award attorney's fees in a divorce case. *See Long v. Long*, 957 S.W.2d 825, 827 (Tenn. App. 1997). On appeal, an appellate court shall not interfere with the trial court's award of attorney's fees except upon a showing of an abuse of that discretion. *Id.*

When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

As a threshold issue, Husband argues that the trial court erred in refusing to enforce the settlement agreement proposal embodied in Grandfather's letter to Wife's counsel, marked "agreed & accepted" and signed by Wife and Husband's counsel. Husband asserts Wife agreed to the terms of this settlement offer and that a valid and enforceable contract was formed. On July 10, 2002, Husband petitioned the trial court to enforce this agreement. Attached to the petition were letters between counsel for both parties, arguing about the terms of the agreement and how the agreement should be worded. In an order dated November 1, 2002, the trial court denied Husband's petition, finding that "there is no basis to enforce the Settlement Agreement because it is void due to its missing certain essential elements and, therefore, it is unenforceable." Indeed, an offer and acceptance which omits crucial terms is not an enforceable contract. ***Doe v. HCA Health Sources of Tennessee***, 46 S.W.3d 191, 197 (Tenn. 2001). From our review of Grandfather's offer letter and the subsequent correspondence between the parties' attorneys, we find no error in the trial judge's conclusion that it was not an enforceable contract. Husband further argues that the settlement agreement should be enforced based on a theory of promissory estoppel. This Court has defined promissory estoppel as

> Where one makes a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and where such promise does in fact induce such action or forbearance, it is binding if injustice can be avoided only by enforcement of the promise.

***Richardson v. Goodall Rubber Co.,*** 1986 WL 9002, *2 (Tenn. Ct. App.,1986) (citing ***Foster & Creighton Co. V. Wilson Contracting Co.***, 579 S.W.2d 422, 427 (Tenn. Ct. App. 1978)). Husband asserts that he relied on the agreement to his detriment because after Husband and Wife signed the agreement, Husband cancelled a hearing before the divorce referee, then Grandfather suffered a substantial loss when he paid the past due mortgage payments of $5,552.08 on behalf of Husband. Husband asserts that Wife received the benefit of partial performance of the agreement and is now estopped from repudiating the agreement.

First, pursuant to a ruling dated October 31, 2001, Husband was under a court order to pay the mortgage on the marital residence while the divorce proceedings were pending. As such, Husband cannot now claim that Wife received a benefit of partial performance that resulted from receiving mortgage payments under the settlement agreement. Further, Husband claims that Grandfather suffered a substantial loss of $5,552.08. We note that Grandfather is not a party to this action and he thus cannot claim promissory estoppel against Wife. Finally, as to Husband's claim that he cancelled a hearing before a divorce referee, we find that Husband suffered no substantial loss as a result of the cancellation. The trial court's decision on this issue is affirmed.

In a related issue, Husband argues that the trial court erred in commenting that by writing the settlement proposal letter to Wife's counsel, Grandfather meddled in the divorce proceedings between Husband and Wife and disrupted and doomed the settlement negotiations between the parties. Regarding Grandfather's role, the trial court stated that "this . . . intrusion . . . by [Grandfather] . . . into this entire matter spoiled the mediation and has had a chilling effect upon any efforts at a negotiated or mediated settlement of this case." On appeal, Husband asserts this was an

error "to the extent that this finding impacted the Trial Judge's ruling in this matter." Husband does not specify how this observation impacted the final ruling. We find that this comment by the trial judge was, in fact, just a comment. Moreover, it is fully justified in the record on appeal. We find no error as to this issue.

We consider Husband's arguments relating to the division of marital assets. Husband notes several comments and rhetorical questions by the trial judge in his oral ruling, and argues that these represent error by the trial court.

Husband argues that the trial court found that he used 5.7 million dollars in 2000 and 1.3 million dollars in 2001 to trade stocks, when these figures represented volume of trades, not value of stock, and that it was not an issue before the court. Husband asserts that the trial judge erroneously implied that these figures represented income for those years. Other remarks by the trial court are asserted by Husband to be erroneous findings of Husband's income at given times, where this was not argued by either party. On these issues, the trial judge commented as follows:

> Court:   Where is the stock portfolio that generated $5.7 million in stock sales just the year before and at year's end 2000, and then would generate $1,360,529 in sales as reported in the tax return for 2001.

> Court:  Again, a question is raised without an answer. Where is the $1.3 million? Where is the $1.8 million in cash that was drained from these companies during the previous year and became the reportable income on which [Husband] paid income tax?
> . . .
> Not only that, it appears from the proof in evidence that [Husband] had cash available from the stock trading account to have paid the tax that was due. It also appears, that given the $1.8 million in income drawn from the company plus the stock trading account, that he had reached levels as high as $5 million plus during the year before; and he had cash available to put into these businesses.

> Court: As I have analyzed Schedule D(1), it appears that stocks were sold over a period of time beginning, if I recall correctly, in November of the year 2000 up to – actually, the latest day is sometime in June of 2001. Total sales of $724,474 and reflects a loss of $104,945.

> If the Wunderlich Securities account had $300,000 in round figures, is there any evidence in this record as to what happened to the other $424,000 and change? If so, what is it.

The comments of the trial court regarding the stock portfolio, taken in total context, show that the trial judge referred to these as "levels" of sales, indicating that the trial judge clearly understood that this represented volume of sales, as emphasized by Husband. The other questions raised by the trial court are clearly rhetorical questions regarding what had become of these assets. These figures

indicate the amount of money generated by Husband and his businesses prior to the filing of Wife's divorce petition, as opposed to the steep plummet in money generated after the filing of the divorce petition. In a related argument, Husband asserts that the trial court erred in determining that his income for 2000 had vanished because this ruling was contrary to the evidence. Based on the record, these are indeed valid comments. However, contrary to Husband's assertion, these were not "findings" in the sense that the trial court utilized the figures to calculate either the amount of dissipated funds or Husband's earning capacity. We find no error on these issues.

Husband argues on appeal that the trial court erred in ruling that Husband dissipated marital assets. Husband cites *Ward v. Ward*, No. W2001-01078-COA-R3-CV, 2002 WL 31845229 (Tenn. Ct. App. Dec. 19, 2002) in support of his position that Wife failed to prove that Husband dissipated marital assets.

In a lengthy and thorough analysis, the trial court cited both the *Ward* decision and *Lee R. Russ, Spouse's Dissipation of Marital Assets Prior to Divorce as a Factor in Divorce Court's Determination of Property Division*, 41 A.L.R. 4th 416, 420-21 (1985). In *Ward*, the Court's analysis of dissipation incorporated the Russ article. The analysis stated:

> Trial courts must distinguish between what marital expenditures are wasteful and self-serving and those which may be ill-advised but not so far removed from "normal" expenditures occurring previously within the marital relationship to render them destructive.
> In determining whether dissipation occurred, we find trial courts should consider the following: (1) whether the evidence presented at trial supports the alleged purpose of the various expenditures, and if so, (2) whether the alleged purpose equates to dissipation under the circumstances. [Lee R. Russ, Annotation, *Spouse's Dissipation of Marital Assets Prior to Divorce as a Factor in Divorce Court's Determination of Property Division*, 41 A.L.R. 4th 416, 420-21 (1985).] The first prong is an objective test. To satisfy this test, the *dissipating* spouse can bring forward evidence, such as receipts, vouchers, claims, or other similar evidence that independently support the purpose as alleged. The second prong requires the court to make an equitable determination based upon a number of factors. Those factors include: (1) the typicality of the expenditure to this marriage; (2) the benefactor of the expenditure, namely, whether it primarily benefitted the marriage or primarily benefitted the sole dissipating spouse; (3) the proximity of the expenditure to the breakdown of the marital relationship; (4) the amount of the expenditure.

*Ward*, 2002 WL 31845229, at *3. In applying the *Ward* analysis to the facts of this case, the trial court first noted that allegations of dissipation must be proven by a preponderance of the evidence, meaning "that amount of evidence that causes the trier of fact to conclude that an allegation is probably true. . . . If the evidence, on a particular issue, is equally balanced that issue has not been proven by a preponderance of the evidence; and the party having the burden of proving that issue has failed." Categorizing the marital assets as either business or personal, the trial court then

-16-

discussed and evaluated each of the seventeen personal marital assets that Wife alleged Husband dissipated. The trial court carefully detailed its reasoning, analyzing documentary evidence and testimony, and weighing the credibility of the witnesses. Some items alleged by Wife were found to be dissipation, others were not. Ultimately, the trial court concluded that the following personal marital assets were dissipated by Husband:

1. $25,000 paid by Husband to private detectives to harass Wife.
2. $15,000 for overpayment of income taxes due to filing separately instead of jointly.
3. $500 for cutting Wife's clothing after an argument.
4. $2,750 paid by Husband for services of a prostitute.
5. $15,788.68 for arrangements for the ill-fated reconciliation trip to Florida.

These personal items totaled $59,038.68, and fifty percent of that amount, or $29,519.34, was awarded to Wife.

In its analysis, the trial court plainly applied the correct legal standard. From our review of the record on the evidence on each item of dissipation, giving appropriate deference to the trial court's determinations of credibility, we find that the evidence clearly preponderates in favor of the trial court's findings. The decision of the trial court is affirmed on this issue.

We next address issues related to Husband's automobile businesses. Initially, Husband argues that certain findings by the trial court demonstrated that the trial judge did not understand the mechanics of the $3.5 million loan from First Tennessee Bank and the subsequent buyout by Grandfather. First, Husband alleges that the trial court found that Grandfather borrowed only $88,000 in order to bring Husband's business entities back into trust with First Tennessee Bank, and that this factual finding was erroneous. Second, Husband contends that the trial court erred in finding that Grandfather sold off collateral and recovered most of the $1,088,000 loan balance, because these assets were sold before Grandfather took over the loan and were used to reduce the loan balance. Husband asserts that Grandfather liquidated the 33 acres on Pisgah Road and the stock portfolio and the businesses' inventory of automobiles in order to reduce the loan to $1,088,000. We evaluate these issues in turn.

We note first that Husband misstates the finding of the trial court; the trial judge did not in fact find that Grandfather borrowed only $88,000 in order to get Husband's businesses back in trust with First Tennessee. Rather, the trial court calculated $88,000 as the amount Southern Wholesale was out of trust with First Tennessee and then went on to note that Grandfather borrowed $1,088,000.

The trial court then observed that one condition of obtaining the loan with First Tennessee was that Husband pay off $1,000,000 to other creditors with a portion of the loan. The trial court noted that Grandfather paid $1,088,000 to purchase Husband's loan from First Tennessee. The trial court reasoned that because Husband owed one million at the inception of the loan and it took $1,088,000 to pay off the loan, then the loan was only "out of trust" in the amount of $88,000. If

this calculation does not accurately reflect the condition of the loan, as set forth below, we, nevertheless, find that the trial court had an overall accurate understanding of the facts, and any misstatement in this regard did not affect the trial court's conclusion or the outcome of this issue.

After a careful review of the record, including the exhibits, the facts appear to be the following:

Grandfather testified that the payoff to First Tennessee was approximately $1.7 million in December 2001. It should be noted that witnesses often testified in approximate amounts rather than exact numbers. The record shows that Grandfather borrowed $1,088,000 to take over the loan from First Tennessee Bank. According to Grandfather's testimony, $1,088,000 reflected the balance due to First Tennessee after liquidation of the 33 acres on Pisgah Road and the securities account owned by Husband and Wife. Grandfather testified that after he took over the loan, he began to liquidate the remaining assets—those of Husband's businesses. Grandfather explained that after all of the assets were liquidated, a deficiency balance of $167,894 remained, for which he filed suit against Husband.

The values of the 33 acres and the securities account ($404,457 and $257,390, respectively) are then added to the amount that Grandfather borrowed to pay off First Tennessee ($1,088,000). These figures total $1,749,847 or approximately $1.7 million, as alleged by Grandfather. This sum, of course, does not include the value of the assets of the businesses, which Grandfather testified were liquidated after he bought the First Tennessee loan. Then, after liquidating the assets of the businesses, Grandfather sued for the deficiency balance of $167,894. As such, the trial court's overall statement that Grandfather recovered most of the $1,088,000 payoff to First Tennessee through selling off the assets appears to be correct.[3]

Husband also argues on appeal that the trial court found that Husband submitted false financial statements to First Tennessee Bank in order to obtain the $3.5 million floor plan loan. Husband cites to the following statement by the trial court:

> Considering all of the evidence on the subject, the Court is absolutely convinced that it is inconceivable that on July 10, 2001, First Tennessee Bank would have closed on all loans to Southern Wholesale, Inc., if it were in the kind of financial shape as depicted by Russell Robinson, Warlow and Butler as they would have us believe existed on the date of closing.

Husband asserts that the Court's finding was not supported by the preponderance of the evidence and should be reversed.

---

[3]We note that the trial court found that the document purporting to show the deficiency balance of $167,894 lacked credibility. This finding was based on the testimony of Jim Butler, who testified that, although he prepared the document, the amounts shown did not have supporting documentation and were, in some instances, his best guess. Of particular interest is the accounts receivable amount of only $6,580. Butler stated that he did not include any receivable over thirty days past due in this total—he essentially "wrote off these amounts."

From our reading of the record, it appears that Husband misstates the trial court's finding. As noted above, the trial court stated throughout its ruling that it did not believe the testimony of Husband or the witnesses who testified on Husband's behalf. Several of Husband's witnesses testified that Husband's business were found to be in a large deficit position shortly after Husband obtained the $3.5 million loan from First Tennessee Bank. The trial court noted that the one thing on which the witnesses who testified on Husband's behalf agreed was

> that an infusion of capital at that point in time was all that was really needed to . . . save the companies. That would have been true even if one should believe the doomsday testimony that was given by each of those witnesses, which the Court frankly does not accept as true.

Thus, the record shows that the trial court did not find that financial statements submitted to First Tennessee, showing a positive net worth for Husband his businesses, were untrue. Indeed, the trial court found the converse to be true. The trial court deemed untrue the statements made by Husband and his witnesses, who testified that the businesses were found to be failing shortly after the $3.5 million loan closed. From our review of the evidence, with due deference to the credibility determinations by the trial court, we conclude that this finding is amply supported in the record.

Next, Husband alleges that the trial court erred in finding that Husband dissipated business assets related to his automobile businesses. The trial court found that Husband dissipated the following business assets:

> 1. $404,457.11 for the value of land owned by Husband and Wife and pledged as collateral for business loans.
> 2. $257,390.97 for the value of the securities account, pledged as collateral for the business loan.
> 3. $50,000 given to Mack Robinson as consideration for guaranteeing Husband's business loan.
> 4. $12,500 as repayment of a loan from Mack Robinson.
> 5. $85,000 paid to an employee of Husband's business while the employee set up mirror corporations for Mack Robinson.
> 6. Fifty percent of the automobile businesses now owned by Mack Robinson, the value to be determined by a special master.

On the dissipation of the automobile businesses, in a classic understatement, the trial court noted that the "analysis [was] complicated by accounting issues [that] are sometimes difficult to understand and by the context of this issue as it interrelates with other issues for trial." The trial court then cited Tennessee Code Annotated § 36-1-121 (c) (5), which provides: (c) In making equitable division of marital property, the court shall consider all relevant factors including . . . (5) The contribution of each party to the acquisition, *preservation*, appreciation, depreciation or dissipation of the marital or separate property. . ." T.C.A. § 36-1-121 (c)(5) (emphasis added).

The trial court noted that the phrase "preservation" was especially relevant to the case at bar and found that:

> the husband in this case failed to do all that any reasonably prudent businessman should have done and would have done if properly motivated—and you may underline those three words—under the circumstances then and there existing in order to preserve . . . the major marital assets consisting of not only the automobile businesses, but the investments acquired from the fruits of the automobile business, such as the stock investment portfolio and even the 33 acres of land adjacent to the marital residence on Pisgah Road where the parties had hoped to build their dream home.

The trial court emphasized the lack of credibility of Husband and witnesses called on Husband's behalf, and found particularly credible the testimony that Husband was driven by love of money, and that, in the event of divorce, Husband would see to it that Wife received nothing. It concluded:

> [T]hat the husband not only failed to protect and preserve–there's that word again–the business and investments, but instead set in motion with the aid and assistance of his father, [Grandfather], a chain of events that was designed to destroy the automobile business for him and to obliterate the marital estate.

Husband now asserts that Wife did not provide "hard evidence" that Husband dissipated assets and did not meet her burden of proof. In *Ward v. Ward*, 2002 WL 31845229 (Tenn. Ct. App. Dec. 19, 2002), this Court overturned the trial court's decision on legal grounds and remanded for a determination of whether the facts presented at trial supported the plaintiff's allegation. *Ward*, 2002 WL 31845229, at *5. On remand, the trial court again ruled for the defendant and the plaintiff appealed again, arguing that the defendant did not produce independent evidence, such as receipts, documents or other similar evidence to support his position. *Ward v. Ward*, 2004 WL 787158 (Tenn. Ct. App. April 12, 2004).

In the second appeal, this Court expanded on the analysis in the prior *Ward* opinion, and specified that there is no rule requiring the production of documents or similar evidence and that a trial court may rely solely on witness testimony. *Ward*, 2004 WL 787158, at *5. More importantly, "when the resolution of issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *Ward*, 2004 WL 787158, at *6 (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Sp. Workers Comp. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)).

In the instant case, the record consists of twenty-three volumes and eighty-eight exhibits and is replete with factual information regarding the automobile business. In fact, the trial court stated that he referred to "six legal pads full of notes taken over the course of these two plus weeks of trial" in making his decision. Further, the trial court based the decision, in part, on the lack of credibility

-20-

of Husband and the witnesses who testified on his behalf. After thorough review of the record, and with due deference to the trial court's determinations of credibility, we find that the evidence fully supports the trial court's conclusion that Husband orchestrated the "demise" of his automobile businesses and Grandfather's acquisition of the businesses from him, in order to prevent Wife from receiving any value from them in the divorce. As a result, we find no error in the decision below.

Husband next argues that the trial court erred in awarding alimony *in solido* from marital assets no longer owned by the spouses. Husband cites ***Aleshire v. Aleshire***, 642 S.W.2d 729 (Tenn. Ct. App 1981) in support of his position. In ***Aleshire***, the husband began his medical residency when the parties divorced. ***Id***. at 731. The wife had a full time job as a college professor. ***Id.*** At the time of the divorce, the husband had no assets from which to award alimony *in solido*. ***Id***. The parties agreed on a division of their joint property with the wife keeping approximately ninety five percent of the assets. ***Id.*** at 734. The wife then argued that the husband's earning capacity, based on his medical degree, was property out of which alimony *in solido* could be awarded. ***Id***. at 732. On appeal, this Court held that "alimony *in solido* should not be awarded out of an expectation of future earnings." ***Id.*** at 733. This Court went on to note that the award of alimony *in solido* from future earnings may be necessary where "a spouse intentionally disposed of his or her tangible assets in order to deprive the other spouse of alimony *in solido*." ***Id.*** at 733.

*Aleshire* holds that, "as a general rule, alimony *in solido* should be paid out of the obligor spouse's present estate and should not be awarded out of an expectation of the obligor's future earnings." ***Abernathy v. Abernathy***, No. M1999-00891-COA-R3-CV, 2000 WL 827949 at *7 (June 27, 2000). To simplify, *Aleshire* states that alimony *in solido* should be *calculated* based on the present estate instead of the expectation of future earnings. ***See Abernathy***, 2000 WL 827949 (June 27, 2000). However, in circumstances such as this, where a spouse dissipated marital assets by failing to preserve them, the award is calculated based on what the marital estate would have been absent the dissipation, and the trial court may then order that the obligor spouse pay the award of alimony *in solido* may be *paid* from future earnings. ***See id.*** In the present case, the trial court awarded Wife a portion of what would have been in the marital estate had Husband not dissipated the assets or by failing to preserve them. As a result, we find no error in the award of alimony *in solido*.

In a similar argument, Husband cites ***Flannary v. Flannary***, 121 S.W.3d 647 (2003) as support for his argument that missing funds may not be considered marital property. In ***Flannary***, the husband hid $48,000 in a drawer in anticipation of the Y2K scare. ***Id***. at 649. The husband stated that he intended to re-deposit the funds after January 2000 but discovered the funds missing. ***Id.*** The trial court held that the money in the drawer was marital property and gave the wife credit for half of the funds. ***Id.*** at 650. The Tennessee Supreme Court reversed, holding that the missing funds were not part of the marital estate because neither party could account for their whereabouts. ***Id.*** However, on remand, the trial court was allowed to consider the husband's careless handling of the funds in the distribution of the marital property. ***Id.*** at 651. ***Flannary***, however, is inapposite because the trial court in ***Flannary*** found that neither party knew the whereabouts of the money—neither party was charged with dissipation of those funds. In the case at bar, the trial court found that Husband purposefully dissipated marital assets, half of which rightfully belonged to Wife.

Based on the circumstances of the case at bar, we find no error in awarding half of the dissipated assets to Wife.

Husband alleges that the trial court erred in imputing gross monthly income of $10,625 to him, using that figure to calculate child support. Husband further alleges that the trial court erred in ordering Husband to be responsible for the costs of private schools for the children. The trial court found that Husband was willfully and voluntarily underemployed and, as a result, imputed income to him.

Husband argues that the record does not support the trial court's finding of underemployment and that the decrease in his income was due solely to the failure of his business. However, the trial court made specific findings of fact regarding the document purporting to show Husband's income as an employee of Grandfather's automobile company. The document indicated that Husband would earn $4,000 per month plus $100 for each car sold over forty per month. The trial court stated, "[l]ook at the handwriting on that document. It seems to the Court to be in the hand of [Husband], not [the manager of Grandfather's automobile business]. The Court believes that [Husband] could have written in whatever amount he wanted, and it would be paid to him."

Husband testified that "prior to the separation he normally worked 50 hours a week, sometimes even 60 hours per week." The trial court also noted the statement attributed to Husband that "[i]f it comes to divorce, he would see that his wife got nothing." Further, the trial court found that the companies now owned by Grandfather, which now employ Husband, are merely the "alter ego of [Husband's] former companies."

The trial court then found that Husband was currently being paid $4,500[4] for a forty-hour work week. It then imputed income based on this rate for an additional 10 hours per week, or $1,125 ($4,500 divided by 40 hours, times 10 extra hours). The trial court also added to Husband's income the $5,000 per month currently ostensibly paid to Grandfather for which he does no work. We find ample evidence in the record to support the trial court's findings. As a result, we find no error in imputing this income level to Husband or in ordering Husband to pay for private school expenses for the children.

Husband argues that the trial court erred in naming Wife as primary residential parent. Husband asserts that Tennessee law creates a presumption in favor of continuity of placement. *Placenia v. Placenia*, 3 S.W.3d 497 (Tenn. Ct. App. 1999). Husband notes that the parties had equal parenting time after the separation and pending the outcome of the litigation, and argues that this equal parenting time should be continued based on the presumption of continuity. Husband further asserts that the trial court granted Wife primary custody because three of the four minor children are

---

[4]Husband's monthly salary increased from $4,000 to $4,500 after he began working for Grandfather.

female, and argues that this is contrary to Tennessee law.[5] The applicable Tennessee statute sets out sixteen factors to consider when making a determination of a permanent parenting plan. *See* Tenn. Code Ann. § 36-4-404 (2001). From the record, it is undisputed that, prior to the parties' separation, Husband "did not participate in the day-to-day activities of the children or the care for the children. . . ." While Husband clearly made efforts to become involved with the children pending the outcome of the litigation, "continuity of placement" would favor having Wife remain the children's primary caregiver. This is buttressed by the evidence of the children's discomfort with Husband's parenting.

Moreover, under Tennessee Code Annotated § 36-4-404(b)(9), another factor for consideration is the "character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child." T.C.A. § 36-4-404(b)(9) (2001). In analyzing the issue of custody, the trial court noted that the psychologist who evaluated both parties, Dr. Ciocca, determined that Husband has a narcissistic personality. The trial court cited Dr. Ciocca's testimony and stated that it is "difficult for narcissistics to raise children that, quote, fit within a culture, end quote, to use Dr. Ciocca's words. And according to Dr. Ciocca, narcissistics have a tendency to put their own needs ahead of those of the children."

This evaluation of Husband is clearly borne out by the evidence in this case. There is substantial evidence of Husband's disinterest in his children and his need to control Wife prior to the parties' separation. In its oral ruling, the trial judge cited Husband's discontinuance of his land line telephone after the separation, leaving the children dependent on his cell phone to call Wife, and his denying the children use of his cell phone for this purpose on occasion. The trial court stated, "not only is this evidence of that narcissistic control, but it is also evidence of putting his own needs ahead of the needs of his children."

Moreover, Husband's choice to dismantle and obliterate the marital estate rather than having Wife receive any portion of it shows narcissistic behavior and character traits that are not conducive to healthy parenting. Despite any comments by the trial judge referring to gender, the record fully supports the trial court's decision to designate Wife as the primary residential parent.

Husband argues that the trial court erred in ordering him to pay Wife's attorney's fees and in ordering the sale of Husband's house to partially satisfy this debt. Husband asserts that Wife was awarded sufficient assets from which to pay her own attorney's fees and that Husband was not awarded assets from which to pay expenses and fees.

In the instant case, the trial court found that Husband dissipated substantial marital assets. A large portion of Wife's award was a credit for these dissipated assets—not liquid assets. Husband

---

[5]T.C.A. § 36-6-412 states:

> It is the legislative intent that the gender of the party seeking to be the primary residential parent shall not give rise to a presumption of parental fitness or cause a presumption in favor of or against such party.

T.C.A. § 36-6-412 (2001.)

was also credited with half of the dissipated assets—again not liquid assets. The sale of the house awarded to Husband provides a portion of the liquid assets needed to pay Wife's attorney.

In a somewhat confusing argument, Husband claims that the sale of the house could not completely fulfill his obligation to pay Wife's attorney's fees and thus it was error to order the sale. Husband cites no authority for this position and we find that the argument has no merit.

The decision of whether to award attorney's fees is within the discretion of the trial court. *Richardson v. Richardson*, 969 S.W.2d 931, 936 (Tenn. Ct. Ap. 1997); *Sherrod v. Wix*, 849 S.W.2d 780, 785 (Tenn. App. 1992). Further, an appellate court will not overturn a trial court's award of attorney's fees absent an abuse of discretion. *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). In this case, the trial court awarded attorney's fees to Wife after finding that Wife "has a very well-demonstrated need for those expenses and [Husband] has a very well-demonstrated ability to pay." We find no abuse of discretion in the award of attorney's fees or in the order to sell the residence.

Husband argues that the trial court erred in finding him guilty of criminal contempt when it did not find him guilty of civil contempt.

The trial court found that "the behavior of [Husband] has been in utter disregard for the orders and writs of this Court" and, as a result, held him in criminal contempt. When asked about the civil contempt charges, the trial court stated

> I considered it and determined that the record was devoid of sufficient evidence upon which the Court could make that finding and did not make that ruling. It was considered and rejected. That's not to say that at someday further down the road, if there should be a motion, petition, or whatever based on proper pleadings and evidence, the Court will consider it.

Husband alleges that the trial court declined to find Husband guilty of civil contempt because "the Court found that the Husband did not have the funds available to purge himself of the civil contempt." Husband then asserts that because he did not have the funds available to purge himself of civil contempt, he could not be guilty of willfully refusing to pay the prior obligations for which he was guilty of criminal contempt.

The trial court found Husband guilty of forty-five separate events of contempt stemming from ongoing refusals to pay court ordered child support, and spousal support and from the deliberate dissipation of marital assets. The trial court noted that evidence supporting this finding was "beyond the shadow of any reasonable doubt and sufficient to convince the whole world."

Civil contempt is defined as the "failure to obey a court order that was issued for another party's benefit. [Civil contempt] is coercive or remedial in nature. The usual sanction is to confine the contemner until he or she complies with the court order." *Black's Law Dictionary* 313 (7th ed. 1999). Criminal contempt is "an act that obstructs justice or attacks the integrity of the court." *Id.*

In this case, the trial court found that a significant portion of the marital assets, namely, the automobile businesses, no longer belonged to Husband but had in effect been acquired by Grandfather. Therefore, Husband no longer had sufficient assets to purge the contempt, and Grandfather was not a party to the litigation. These assets were lost as a result of Husband's dissipation. Under these circumstances, criminal contempt may be appropriate where civil contempt is not.

Contempt proceedings lie within the sound discretion of the trial court. ***Writesman v. Writesman***, M1999-00726-COA-R3-CV, 2000 WL 1367965, *7 (Tenn. Ct. App. 2000) An appellate court will not modify a punishment imposed for contempt unless the complaining party can show abuse of discretion. ***Id.*** Husband has shown no abuse of discretion and we find no error in the trial court's decision.

On appeal, Wife has requested an award of costs and attorney's fees for the appeal. We find such an award appropriate, and remand the cause to the trial court for a determination of the amount of reasonable attorney's fees for this appeal.

The decision of the trial court is affirmed and the case is remanded for further proceedings not inconsistent with this Opinion. Costs of the appeal are taxed to Husband, Russell Raynor Robinson, and his surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE